EDWARD S. RAND & another *vs.* JOHN H. HUBBELL & others.

Suffolk. March 31. — September 4, 1874. AMES & DEVENS, JJ., absent.

Whether the distribution, by a corporation, of its earnings among its stockholders is an apportionment of stock, or a division of profits, depends upon the substance and intent of the action of the corporation, as shown by its votes.

A corporation voted to increase the number of shares of its capital stock, so as to allow each stockholder to increase the number of shares held by him by one half, and commanded the directors to do whatever was required by law for that purpose. A vote of the directors, passed on the same day, declared that a dividend in cash should be payable to each stockholder at the time within which he was allowed by the vote of the corporation to take his new shares, and should be applied by him in payment for those shares ; and directed the treasurer to issue such shares to old stockholders only. Each stockholder received a check for the amount of his dividend, and immediately exchanged the check for a certificate of the shares apportioned to the stock held by him. The checks were then destroyed, and were not presented at the bank. *Held,* that the stock issued in compliance with the above votes constituted a stock dividend; and that in the case of shares of old stock held by a trustee, the new shares must be considered an addition to the capital of the trust fund.

When the directors of a corporation vote a cash dividend for the purpose of paying for new stock to be issued to its stockholders, the whole transaction constituting in fact a stock dividend, if the issue of the stock is void because of non-compliance with the provisions of the St. of 1870, c. 179, the cash dividend will fall also, and cannot be claimed by a person entitled to the income of certain shares of said stock.

BILL IN EQUITY by the administrators with the will annexed of Sarah Louise Hubbell, to obtain the instructions of the court as to whether certain shares of stock should be inventoried as part of the estate of said Sarah Louise, and whether said shares were income or capital. The case was reported by *Ames,* J., for the determination of the full court, in substance as follows :

Sarah Louise Hubbell died September 10, 1873. By her will, which was duly proved October 7, 1873, she disposed of her entire estate, real and personal.

Peter Hubbell, by his last will, which was proved February 14, 1871, gave to his wife, the said Sarah Louise, during her life, the use, income and improvement of all the rest and residue of the estate, real, personal and mixed, of which he should die seised or possessed or entitled to, remaining after payment of his debts and sundry legacies, with full power to sell and reinvest proceeds at her discretion; and on her decease, such rest and residue to his heirs at law of lineal descent; and appointed her executrix of his will. She was also required to pay an annuity of $3000 to the son of the testator, and legacies of $1000 each to nine nephews and nieces.

He died January 9, 1871, and was at the time of his death the owner of 1355 shares of the capital stock of the Bay State Brick Company, a corporation organized under the general laws of Massachusetts, the capital stock of which was, down to April 14, 1873, $500,000, divided into 5000 shares of $100 each. The certificates for said 1355 shares stood in the name of Peter Hubbell, until the transaction of May 23, hereinafter mentioned.

On April 14, said corporation at a legal meeting of its stockholders passed the following vote: " That it is expedient to increase the capital stock of the company to the amount of two hundred and fifty thousand dollars, so that the capital stock shall be seven hundred and fifty thousand dollars, instead of five hundred thousand dollars as now constituted, divided into shares of one hundred dollars each; and that each stockholder of record of this date be entitled to one share in the new stock so created for every two shares held in the old stock; that said capital be increased accordingly, and that the new stock be paid for and taken on or before the 15th day of May, A. D. 1873; and that the directors be authorized and directed to take the requisite steps to this end, and do whatever is required by law for this purpose; and that new certificates be issued according to law."

On April 14, the directors of said corporation passed the following votes: " That an extra and special dividend of fifty dollars a share be paid on or before May 15, 1873, to holders of the old

stock as it stood April 14, 1873, the dividend to be applied by the stockholders in payment for the new stock created." " That in issuing stock under the recent vote of the stockholders the treasurer be authorized to recognize assignments of fractional parts of new shares among the stockholders ; but he is not to issue new stock to other than the old stockholders without further action of the directors."

On the same day, the treasurer of said corporation issued to each stockholder therein the following notice : " By a vote of the stockholders the company has increased its capital stock to the extent of $250,000 more. Holders of shares of record April 14, 1873, are entitled to one share of the new stock for every two of the old, with a right to transfer fractional shares as between each other. An extra dividend has been ordered of fifty per cent. on the old stock, payable May 15, 1873, which is to be taken in payment of the new stock. Please call, take the stock and dividend, and pay for the same. Please bring your old certificate."

The treasurer of the corporation made out checks upon the Blackstone National Bank for the respective amounts of the dividends so ordered by the directors, and intrusted them to the clerk of the corporation, from whom each stockholder received the check for the amount of his dividend, and gave therefor a receipt upon the dividend book of the corporation in the form hereinafter set forth ; and on receiving the check, he was told by the clerk to take it to the president of the corporation ; and he accordingly took the check to the president in the adjoining room, and exchanged it for a certificate of the shares apportioned to the stock held by him, and gave a receipt for the shares. This was the course of proceeding adopted by the officers of the corporation, and this course was pursued by every stockholder, except perhaps in one or two cases, when the clerk was absent, the president transacted the business ; and all the new stock was issued in this manner. After this use was made of the checks they were all destroyed. None of them were ever presented at the bank. In the case of fractional shares, parties concerned settled among themselves by payments in cash. The moneys of the corporation were from day to day deposited in the Blackstone National Bank, to the credit of Job A. Turner, treasurer, and drawn out and used in the transaction of the business of the corporation.

The checks were received by the respective stockholders on different days from May 14, to July 7, 1873, on which days there were on deposit in said Blackstone National Bank certain amounts to the credit of the treasurer ; but these amounts were not specially provided or expected by the corporation to be drawn upon for the payment of said checks, nor were they sufficient therefor ; but they were used by the corporation in the ordinary course of its business in the same manner as if no such checks had been given. Moneys were deposited by the corporation in said bank, and drawn out and expended from day to day in its business without regard to said checks. It was taken for granted that each stockholder would take his proportion of the new stock, and would use his dividend check to pay for it. All of the dividend checks were used in that manner ; and the corporation was not prepared, and its officers did not expect, to pay them in any other manner. The bank account was not disturbed by any of these transactions, except so far as fractional shares were concerned, which were bought and sold. The corporation had no other bank account.

Warren Sanger was employed by Sarah Louise Hubbell, from the time of her appointment as executrix of the will of Peter Hubbell, to act for her as executrix, and in the management of her personal affairs. She left for Europe on November 9, 1872, and returned to the United States in August, 1873. Just before leaving, she gave to Sanger a power of attorney. Sanger received, on or about April 14, 1873, the notice to said executrix of that date, issued by the treasurer to the stockholders as before stated. He was present at the meeting of stockholders of April 14th, and knew of their vote. He did not see the vote of the directors, but gathered its purport only from the notice. On May 23, 1873, he received from the clerk of the corporation a check signed by the treasurer for $67,700 on the Blackstone National Bank, and signed a receipt therefor in the name of Sarah Louise Hubbell, executrix, by him as her attorney, in the form following : " We, the subscribers, acknowledge to have received of the treasurer of the Bay State Brick Company a dividend of the sums severally set against our names, being extra and special dividend of $50 per share, payable May 15, 1873. May 23. S. Louise Hubbell, Ex. Warren Sanger, Attorney."

On receiving this check, Sanger was told by the clerk to take it to the president of the corporation in the other room, and receive the certificate of the stock from him. He accordingly carried the check immediately to the president, and delivered it to him, and received certificates of 677 shares, for which he gave receipts. These certificates imported that the estate of Peter Hubbell was entitled to the shares.

Sanger was asked by the counsel for the heir of Peter Hubbell, " Did you understand that you could use the check for any other purpose than to pay for the stock ? " This question was objected to ; but the presiding judge ruled that it might be put ; he thereupon answered that he understood that he could use the check only for that purpose ; and to this ruling the counsel for the legatees of Mrs. Hubbell took exception.

Mrs. Hubbell arrived at New York, on her return from Europe, in August, 1873, very ill, not able to reach her home, and she died at a hotel in New York. Sanger saw her about three weeks before her death, and repeated to her orally what had been done, and that he had acted under the advice of her counsel in taking the new stock. Her mind was perfectly clear, but she did not express either assent or dissent. No papers were exhibited to her, nor did she know the form in which the certificates were taken. She was told that her counsel said it was a stock dividend.

On April 14, 1873, the surplus earnings and accumulations of the corporation were invested as shown by the statement of all its assets and liabilities then existing, contained in the report of the treasurer, amounting to $259,450.62.

No property was sold or converted into money to raise funds for the payment of said dividend or said checks, nor was any money ever specially provided or designed by the corporation for the payment thereof ; nor did the corporation, in fact, have cash on hand at any time sufficient for the payment thereof, or of any considerable part thereof ; nor were any moneys applied or used for the payment of any of said checks or dividends.

Yearly reports were made to the stockholders by the treasurer, showing the entire property of the corporation taken at cost or estimated as aforesaid, and all its liabilities made up in like man ner, and showing a balance called " surplus," as follows :

|                           |              |
|---------------------------|--------------|
| 1870, April 1, surplus .  .  .  .  | $108,211.50 |
| 1871, April 1,   "        .  .  .  . | 122,123.02 |
| 1872, April 1,   "        .  .  .  . | 182,886.91 |
| 1873, April 1,   "        .  .  .  . | 259,450.62 |

The "brick-yards, including land, buildings, machinery and the like, at Cambridge and Medford, owned by the corporation, were taken in some of these reports at their cost, $535,317.53; but the president of the corporation testified that in his opinion it would take somewhere between $750,000 and $1,000,000 to replace as much property as the corporation owned in Cambridge and Medford, and that the land on Columbus Avenue and Stanhope Street in Boston, taken at its cost, $56,949.60, was worth $150,000 or possibly $200,000.

Cash dividends were declared by the corporation semi-annually of from four to five dollars per share from 1871 to 1873.

On January 7, 1868, the directors passed the following vote : "Voted, that a stock dividend be declared of 25 per cent. on the capital stock of the company, certificates of the same to be issued by the treasurer on or before April 1, 1868." And the stockholders at their meeting February 5, 1868, voted, "That the capital stock be increased so that the same shall be in amount $500,000, divided into shares of the par value of $100 each; that the new shares be issued to the stockholders of January 1, 1868, in the rates of one new share for every four old shares; and that the extra dividend declared at the directors' meeting held January 7, 1868, called stock dividend, be received, and applied in payment for the new shares to be issued, the holders of stock having the rights to sell and transfer their claims for the new stock for fractional parts of shares."

The new stock was issued in pursuance of these votes. As to the market value of the shares, it appeared that there were never many transactions in it in the market. The stock was confined to a limited number of owners at first, and was for the most part kept by them among themselves. Before April 14, 1873, there had been sales at from par to ten per cent. premium, and after that date there had been a few sales at par, and one at 95 per cent. When the new stock was created, the directors expected to be able to pay half-yearly dividends at the same rate as before.

John H. Hubbell, one of the respondents, contends that said shares are capital and belong to the estate of Peter Hubbell, and that he is under the will of Peter Hubbell entitled to the same ; and the other respondents, who were the residuary legatees and devisees under the will of Sarah Louise Hubbell, contend that the dividend of 50 per cent. belonged to said Sarah Louise ; that it was the duty of the directors to sell the said 677 shares, as they remained untaken on May 16, and that the proceeds, to the extent of their par value, would belong to the corporation, and any premium to the capital of the trust fund ; that if the issue of the new certificates cannot now be set aside, the new shares should be treated as taken and paid for at par by the said Sarah Louise out of her own property, and that said shares should be sold now under the order of this court, and their proceeds, to the extent of their par value, should go to the estate of said Sarah Louise, and any premium to the heir of Peter Hubbell, her estate making good any loss of premium incurred by lapse of time since May, 1873 ; or that such order be taken as shall substantially secure to the estate of said Sarah Louise the value of the cash dividend, and to the heir of Peter Hubbell the value of the right to take the new shares under the vote of the stockholders.

The case is reserved for the consideration of the full court; such disposition thereof to be made, or such order to be entered therein as shall be proper ; and the court may make such inference from the facts stated as a jury would be justified in doing.

*E. S. Rand*, for the plaintiffs.

*H. W. Paine & R. H. Dana, Jr.*, for the legatees under the will of Mrs. Hubbell. 1. It is often expedient for a corporation to create new stock, either to raise money, or for the purpose of making the nominal capital represent more nearly the actual capital, when the latter has greatly increased. In doing this for the latter purpose, it was formerly lawful for a corporation to issue the new shares gratuitously to the stockholders. That was a stock dividend. The St. of 1870, *c.* 179, prohibits stock dividends. Since this act corporations can increase their stock only in accordance with the rules there laid down. This statute recognizes and defines the right of the stockholder to be the right to take his proportion of new shares at par. The value of that right it measures by the premium the new shares will bring at auction. The St. of

1871, *c.* 392, § 4, authorizes a corporation to disregard this preemption of the stockholder at its discretion, and to sell the new stock by auction in the first instance. The result of these statutes, so far as concerns the rights and duties of the corporation, is that when new stock is created, no matter for what purpose, the corporation must sell it for not less than par. It may or may not, at its discretion, offer the stockholder the preëmption at par. If it does not, or if the preëmption is refused, it must sell at auction, and, in the latter case, pay the premium to the stockholder. So far as concerns the rights of the stockholder, they are limited to the preëmption of his proportion at par, even that being at the discretion of the corporation; and the value of his preëmption, if he has it allowed him, is the premium.

The action of the corporation of April 13, 1874, was intended to be in conformity with this law. The stockholders voted an increase of stock; settled the proportion to be one share of new for two of old; recognized the right of the stockholders to take the new shares in that proportion; fixed the time within which the stockholder must exercise his option of thirty days, the shortest time allowed by the statute; and required the directors to take all necessary steps " required by law," and to issue the new certificates " according to law." This vote was simply a creation of new stock. It recognized the rule that the new stock must be " paid for " by the old stockholder. The vote was not only consistent with but strictly in pursuance of the St. of 1870. Under that vote and the St. of 1870, unless the stockholder took his new shares within thirty days, and " paid for " them, he lost his right to them, and they were required to be sold at auction. There can be no doubt that, under this vote, a tenant for life, who is also trustee for the remainderman, would be under no obligation to furnish the money to pay for the new shares, and that his duty would be done if he required or allowed the new shares to be sold by the directors under the St. of 1870, and carried the premium to the capital of the trust fund. Under this vote of the stockholders, and the St. of 1870, a tenant for life had no interest in taking the new stock at par, and the right of the remainderman is conclusively settled to be the privilege of taking his proportion of new stock at par; and the value of this preëmption is the premium, ascertained by a public auction. *Atkins* v. *Albree*, 12

Allen, 359. *Gray* v. *Portland Bank*, 3 Mass. 364. St. 1870, *c.* 179.

2. If the directors counteracted this vote, their action was void. But they did nothing necessarily inconsistent with that vote and the St. of 1870. They passed two distinct votes. The first related to a cash dividend, as to which the stockholders had taken no action. The second related to the issue of new stock "under the recent vote of the stockholders." It recognized the possibility that some stockholders might not take their shares, though at a premium, as in the case of trustees having no funds, and that such shares would have to be issued "to other than the old stockholders." They gave the notice to the old stockholders required by the St. of 1870. As all the new shares were in fact taken by the old stockholders, they were not called upon to sell them by public auction under the St. of 1870. If any had not been so taken, the occasion would have arisen for the "further action of the directors" referred to in their vote; as, for instance, providing for the auction, the form of certificates, the distribution of the proceeds (the par value to the corporation and the premium to the old stockholders), perhaps the recital that the shares were not taken within the time limited, and anything else rendered proper under the new system introduced by the statute. It is true the directors did not, in practice, adhere to the letter of the statute requiring them to treat the shares not taken within the thirty days as abandoned. They probably considered it a right of the corporation which might be waived. Very likely the stockholders who took their certificates after May 15 may have given notice of their intention to take them before that date. Or, the directors may well have thought that their omission to insert the time in the notice may have entitled the stockholders to take their shares within a reasonable time.

3. The vote declaring the dividend of fifty per cent. is an act of the directors only, distinct from and independent of the act of the stockholders creating the new stock. It is in form a declaration of a cash dividend. "That an extra and special dividend of fifty dollars a share be paid on or before," &c. The directors did in fact give, for this dividend, to each stockholder, a check upon their bank, payable absolutely, and took from each stockholder a receipt as for a cash dividend. No order was given to the bank

not to pay these checks, and no notice given to the stockholder that they would not be paid. If any stockholder had taken his check to the bank, it would have been paid, certainly to the extent of the funds in the bank. If he took his new stock, he had a right to pay for it in cash. It was immaterial to the corporation whether he gave the check for the new stock, or paid cash and drew the check. It was also immaterial to the corporation whether he paid for his new shares before he received his dividend or after. It is true, the vote of the directors declaring the cash dividend says : " The dividend to be applied by the stockholders in payment for the new stock created." This clause of the vote is immaterial in determining the rights of third parties, unless it has the effect of resolving the entire transaction of April 14, of the stockholders and directors alike, into the creation of a stock dividend, to wit, the gratuitous distribution of the new stock among the old stockholders, in violation of the St. of 1870. Even if the directors intended to evade the statute, the court will construe the entire act as being not in violation of the statute, if possible, in a question between third parties. This clause in the vote may mean simply that the check given would be received as payment for the stock, if the stockholder exercised his preëmption. To give it the effect of turning the entire transaction into a stock dividend, in violation of the statute, it must be construed as depriving the stockholder of his option. It is not enough to construe it as establishing an order of business in the taking of the new stock, even to the extent of saying that the new stock would not be issued for anything else than the identical check given in to be cancelled ; for, perhaps, it was competent for the directors to establish such a rule of business for those who took the new shares. To sustain the case of the remainderman, it is necessary to construe it as an order that no stockholder should exercise his option, but must receive his shares in exchange for his dividend or be deprived of both, and to hold that such action was competent as against a stockholder. Such a construction is not necessary, and, unless it be the only possible construction, will not be adopted. The corporation has never acted on that construction, there having been no case of a stockholder refusing to take his shares. · It would be a most unreasonable construction in its operation, as it would give to the stockholder who took his shares their full value

par and premium alike, and deprive the stockholder who declined to take his shares of the shares and the dividend both. If the clause necessarily has that extreme construction suggested for the remainderman it may be treated as a void act, as inconsistent with the statute and the vote of the stockholders; and the entire transaction of April 14 may be treated as the creation of new stock under the statute of 1870, and the simultaneous declaration of a cash dividend sufficient to enable the stockholder to pay for his new shares if he chose to take them, notwithstanding that clause in the vote of the directors.

4. It is contended for the remainderman that the fact that the company made no extraordinary deposit in the bank sufficient to meet extraordinary drafts for the cash dividend shows that the dividend was formal only and that the whole transaction was intended to be a stock dividend. But that fact does not prove even such an intention. The directors properly assumed that the stockholders, or most of them, would take their new shares, as they were very valuable, more so than a public sale would indicate, for their value was better known to the stockholders than to the public. Also, the directors probably held a large part of the stock themselves. It was in few hands, and they knew, or could probably easily learn, how far the new shares would be taken. If any large amount of new shares was refused, they could easily make good the checks by new deposits on any day or hour, and the sale of shares so refused would make good the amount of the checks paid. And they established an order of business which, whether obligatory on those who took the new shares or not, would doubtless be followed in most, if not all cases, and save the necessity of keeping an extraordinary deposit for thirty days or more.

5. The condition of the corporation made it judicious for it to do two things: first, to declare a large extra dividend based on surplus earnings and values; second, to create a large amount of new stock, so that the nominal capital might represent more nearly the actual capital. It was not necessary that the amount of the cash dividend should be determined by the par value of the stock; but it was convenient both to the treasurer and the stockholders to make them equal, as the check given for the one, or its proceeds, might be paid for the other. It was not necessary to the carrying out of the vote for a cash dividend that the corporation

should have that amount of cash on hand, or of cash and floating capital immediately convertible into cash. In addition to the "plant," and everything used in the work of the company, the convertible capital would have paid the dividend, if necessary: but, for the reasons previously stated, it was not necessary to actually convert any capital into cash. Not only would most stock holders take the new stock, but if any large number refused it, the proceeds of its sale in the market would have balanced the checks of those who refused. Indeed, even if the corporation had acted under the St. of 1871, and sold the whole of the new stock in the market, in the first instance, its proceeds would have paid the cash dividend of fifty per cent. without disturbing any of the floating capital.

6. There is nothing in this case which makes pertinent the cases of *Minot* v. *Paine*, 99 Mass. 101; *Daland* v. *Williams*, 101 Mass. 571; or *Leland* v. *Hayden*, 102 Mass. 542. In *Minot* v. *Paine*, there was no pretence of a cash dividend. It was in form and in fact a stock dividend, and such dividends were then lawful. In *Daland* v. *Williams*, the court held that while there was some form of a cash dividend kept up, it was in fact a stock dividend, and that the forms were only a color to evade the statutes of Maine, which prohibited stock dividends. But stock dividends were then lawful in Massachusetts, and the court was not obliged to construe the acts of the corporation as within the law of another state, or to declare them void. The facts upon which the court went were different from the facts in this case. In that case the treasurer was not to pay the forty per cent. dividend at all. He was to give certificates of new stock for it. The whole transaction was in fact the giving of certificates for new stock and calling their par value a cash dividend. In the case at bar, the stockholders ordered the new stock "to be paid for" by the stockholders who took it, and made no reference to a cash dividend. The directors voted a cash dividend to "be paid," and gave the stockholders checks for it, absolute on their face, which the stockholders could have used. In that case the stock brought a premium of sixty-three per cent., which rendered the option practically nothing. There was no cash or floating capital, on which the pretended dividend was based. All the surplus had been invested in the "plant" of the corporation, and was practically inconvertible. In the case at

bar, the cash dividend is based on floating capital and convertible property. *Leland* v. *Hayden* was decided when stock dividends were lawful. Moreover, the facts which induced the court to treat the second dividend of twenty per cent. as a stock dividend, do not exist in this case. It was provided in that case by the vote that if a shareholder refused to take his new shares, they should be sold on his account, and that he should receive the proceeds of the sale instead of his dividend of twenty per cent., while the proceeds would be much larger than the dividend, as the new stock brought a high premium. This provision was conclusive. It treated the new shares as his, whether he accepted them or refused them. In the present case there was no such vote. The rights of parties were in terms left to the operation of the laws, and if a stockholder refused to take his new shares, they would be sold for the benefit of the corporation, which is conclusive that the shares were not his; in other words, that it was not a stock dividend. The second twenty per cent. dividend was not based on any floating capital as was the first dividend. The corporation had not the double purpose as to its second twenty per cent. dividend which the corporation in this case had, viz. : to make an actual dividend based on surplus earnings, not irrevocably invested in the " plant " of the corporation, and at the same time to increase the stock so that the nominal capital might more accurately represent the actual capital.

7. In case of doubt between the tenant for life and remainderman, there is no policy in this country which should induce a court to favor the latter. In the case of a trust established by will, evidently for the purpose of providing a support for a widow for life, the inclination of the court should be, in doubtful cases, to treat dividends as income. *Reed* v. *Head*, 6 Allen, 174. *Harvard College* v. *Amory*, 9 Pick. 446. *Balch* v. *Hallett*, 10 Gray, 402. *Simpson* v. *Moore*, 30 Barb. 637. *Lord* v. *Brooks*, 52 N. H. 72. *Bradlee* v. *Appleton*, 16 Gray, 575. *Harris* v. *Knapp*, 21 Pick. 412. In this case there is the further consideration that the testator required his widow to pay out of the income an annuity of $3000 to John H. Hubbell, and legacies of $1000 each to nine nephews and nieces, and that it was evidently his intention to give to his widow the fullest powers to use and deal with the estate, subject only to the obligation to preserve the capital undiminished in value for transmission to the final legatee.

*S. Bartlett & B. F. Brooks,* for the remainderman.

GRAY, C. J.   Money earned by a corporation is corporate prop erty; and not the separate property of the stockholders, unless and until distributed among them by the corporation.   In the absence of any restraining statute, the corporation may treat it and deal with it, either as an increase of its property or as profits of its business.   So long as the corporation holds it as part of the corporate property, it is capital of the corporation, and the interest therein, represented by each share, is capital and not income of that share, as between the tenant for life and remainderman, legal or equitable, thereof.   When a distribution of such earnings is made by the corporation among its shareholders, the question whether such distribution is an apportionment of additional stock, or a division of profits, depends upon the substance and intent of the action of the corporation, as shown by its votes.   It would be impracticable for the courts, in determining the comparative rights of different persons in a particular share of stock, to go behind the votes of the corporation and its directors, and investigate the accounts and affairs of the corporation, in order to ascertain how the corporation acquired the funds out of which the dividend was declared.   *Minot* v. *Paine*, 99 Mass. 101.

The English judges, though varying in opinion upon the effect of particular votes declaring extraordinary dividends, have all agreed that the determination of each case must turn upon the legal construction of the vote of the corporation.   In the earliest cases on the subject, Lord Loughborough and Lord Eldon, each sitting as chancellor, as well as the House of Lords acting upon their joint advice, declined to enter upon an inquiry to ascertain when each part of the profits had arisen, or, in the words of Lord Loughborough, " hunt it back."   *Brander* v. *Brander*, 4 Ves. 800, 801.   *Irving* v. *Houstoun*, 4 Paton's House of Lords Cases, 521, 531.   *Paris* v. *Paris*, 10 Ves. 185, 190.   *Barclay* v. *Wainewright*, 14 Ves. 66, 78.   In *Price* v. *Anderson*, 15 Sim. 473, 477, Vice Chancellor Shadwell said : " The question must be determined by the mode in which the company have dealt with their profits."   And in one of the latest cases, Vice Chancellor Wood (since Lord Chancellor Hatherley) expressed the same rule more fully, as follows : " As long as the com pany have the profit of the half year in their hands, it is for

them to say what they will do with it, subject, of course, to the rules and regulations of the company." " The dividend to which a tenant for life is entitled is the dividend which the company chooses to declare." " Where the company, by a majority of their votes, have said that they will not divide this money, but turn it all into capital, capital it must be from that time." *In re Barton's Trust*, L. R. 5 Eq. 238, 243–245.

By the law of this Commonwealth, as declared by this court, a dividend made in new stock is ordinarily to be deemed capital. Thus when the vote of the corporation is to distribute to each stockholder a certain number of additional shares in the corporation in proportion to the amount of shares already held by him, the shares so distributed are received by the stockholder as capital and not as income, although the means of making the dividend are derived from the net earnings of the corporation. *Minot* v. *Paine*, 99 Mass. 101. And when a corporation votes to increase its capital stock and to allow the holders of the old shares to subscribe for the new ones *pro rata*, and that any new shares not so taken shall be sold by the directors and the premiums realized by the sale paid over to the parties entitled to the right of subscribing for the shares, the sum received by the directors upon such a sale is capital to the stockholder. *Atkins* v. *Albree*, 12 Allen, 359.

Even when, at the time of the creation of new shares to be distributed among the old stockholders, a dividend is declared in cash to the same amount, the thing received by each stockholder, whether in stock or in cash, is to be deemed capital and not income, if such appears upon a view of the whole action of the corporation to be the real character of the transaction. Thus, if a corporation votes to create new shares, and at the same time declares a dividend payable in cash to the stockholders, and authorizes its treasurer to receive this dividend in payment for such shares, and to issue certificates of stock in return, the dividend is, as between the owners of successive interests in the shares, capital, and not income, although the corporation is not allowed, by the law of the state in which it is established, to make stock dividends. *Daland* v. *Williams*, 101 Mass. 571. So where a corporation voted to create new shares, to be issued and disposed of as the directors should deem proper; and the directors

voted to offer to eacn stockholder the right to take at par twenty per cent. of a new share for each old share held by him, and that if any one should not avail himself of his right, it should be at the disposal of the directors ; and the directors on the same day declared a dividend of twenty per cent. in cash derivable from the shares which the stockholders should respectively pay for the new shares taken by them under the preceding vote ; it was adjudged that a trustee holding stock in the corporation, whether he received the amount of his dividend in stock, or suffered the stock to which he was entitled to be sold by the directors and received the dividend in cash, took it, in either alternative, as capital and not as income. *Leland* v. *Hayden*, 102 Mass. 542.

On the other hand, dividends which appear to have been intended by the corporation as dividends of profits, and not as a distribution of capital stock, are to be deemed income of the shares on which they are paid. Thus dividends made in cash by a manufacturing corporation, though made out of money received from the sale of patent rights and a large amount of castings, are income and not capital. *Harvard College* v. *Amory*, 9 Pick. 446. So cash dividends made by a land company, whose business is to sell lands, out of sales of land which is the corporate property, have been held, in the absence of any controlling facts, to be income and not capital of a trust fund created by the will of a stockholder. *Balch* v. *Hallet*, 10 Gray, 402. *Reed* v. *Head*, 6 Allen, 174. And where a dividend, declared to be made out of the earnings of the corporation, is not made in the form of cash, but in old shares of the corporation itself, in which it has invested the amount, it is income of the shares previously held by the stockholders. *Leland* v. *Hayden*, 102 Mass. 542.

In the case at bar, the material facts, by the application to which of the rules already stated the decision must be governed, are as follows : On April 14, 1873, the corporation voted that its capital stock be increased by one half, that each stockholder of that date be entitled to one new share for every two old shares, that the new stock be taken and paid for on or before May 15, and that the directors should do whatever was required by law for this purpose. On the day on which this vote was passed, the directors voted " that an extra and special dividend of fifty dollars a share be paid or or before May 15, 1873, to holders of the old stock as it stood

April 14, 1873, the dividend to be applied by the stockholders in payment for the new stock created ; " and that the treasurer should not issue the new stock to other than the old stockholders without further action of the directors. On the same day, the treasurer issued a notice to each stockholder, stating that the corporation had increased its capital stock; that each stockholder was entitled to one share of the new stock for every two of the old ; and that an extra dividend had been ordered of fifty per cent. on the old stock, which was to be taken in payment of the new stock , and ending thus : " Please call, take the stock and dividend, and pay for the same." Every stockholder received from the officers of the corporation a check for the amount of his dividend, signed a receipt therefor, and immediately exchanged the check for a certificate of the shares apportioned to the stock held by him. After this use had been made of the checks, they were all destroyed and none of them ever presented at the bank. Mrs. Hubbell, who held shares as the executrix of her husband's will, and was entitled by that will to the income thereof during her life, being absent in Europe, the acts in her behalf were done by her attorney, communicated by him to her upon her return, and silently acquiesced in by her.

Upon these facts, it is clear that the intention of the corporation and of its directors and officers was to make a stock dividend, and a stock dividend only. The vote of the corporation was to increase the whole number of shares, and to allow each stockholder to increase the number of shares held by him, by one half; and commanded the directors to do whatever was required by law for this purpose. The vote of the directors, passed on the same day. declared that a dividend in cash should be payable to each stockholder at the time within which he was allowed by the vote of the corporation to take his new shares, and should be applied by him in payment for those shares ; and directed the treasurer to issue such shares to old stockholders only. The notice issued by the treasurer to the stockholders, and the subsequent dealings between each stockholder and the officers of the corporation, proceeded upon the same theory, and are inconsistent with any other. No money was ever paid, or intended to be paid, by the corporation to any stockholder. The declaring of the dividend in cash, and the giving of checks therefor, were mere forms

adopted to carry out the scheme of creating new stock and distributing it among the stockholders.

The St. of 1870, c. 179, appears to us to have no bearing upon this case, except as affording an explanation of the circuitous course followed by the corporation to attain its end. If the issue of new shares was void, because of non-compliance with the provisions of the statute, the vote to pay a dividend in cash to each stockholder for the sole purpose of being applied to take up such shares would fall with it ; for it could not be held that a separate dividend of profits was made, against the manifest intent and purpose of the whole transaction.

It follows that neither the proportion nor the nature of each stockholder's interest in the corporate property is affected by the question of the validity or invalidity of the new issue ; and that in either alternative the new shares are not to be deemed income of the old shares left by Mr. Hubbell at his death, and as such belonging under his will to his widow. The case falls within the decision in *Daland* v. *Williams*, 101 Mass. 571, already cited.

*Decree accordingly.*