* PRITCHITT v. NASHVILLE TRUST CO.

(*Nashville.* September 2, 1896.)

CORPORATIONS, PRIVATE. *Rights of life tenant and remaindermen as regards stock dividends.*

A life tenant is entitled to stock dividends declared from net earnings made after the respective rights of the life tenant and remaindermen have attached to corporate stock bequeathed to them.

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. THOS. H. MALONE, Ch.

C. D. BERRY and VERTREES & VERTREES for Complainant.

JOHN ALLISON and E. H. EAST for Defendant.

CALDWELL, J. Samuel Pritchitt died testate at his residence, in Davidson County, on the twenty-first day of September, 1891. The second item of his will is in the following language: "I will, devise, and bequeath to my wife, Ann Pritchitt, all the real estate I die seized and possessed of, for

---

* The authorities as to the relative rights of the owners of the capital stock and income with respect to increased stock and stock dividends are collected in a note to *Schooner* v. *Phillips* (Conn.), 16 L. R. A., 461.—REPORTER.

and during her natural life; also, one-fourth of all the balance of my estate, not including what is herein given her absolutely, for her life, and, at her death, the real estate and the said one-fourth of the balance of my estate is to be divided between my two sons, H. C. Pritchitt and Samuel Pritchitt, Jr., and my grandchild, Annie P. Draughan, only child of my deceased daughter, Nettie P. Draughan, share and share alike. All my household furniture, carriage, buggy, and horses are willed to my wife absolutely." One item of that part of the testator's property designated by him as "the balance of my estate," was $100,000 of stock in the Nashville Gaslight Company, and therefore "one-fourth," $25,000, of that stock passed to his widow, "for her life," with remainder to his two sons and his granddaughter. The will was promptly probated, and, thereupon, $25,000 of the stock was transferred, by consent, to the Nashville Trust Company, to hold as trustee for the parties entitled under the second item of the will.

On the twenty-ninth of June, 1892, the directors of the gaslight company declared "a cash dividend of five per cent." and "a stock dividend of ten per cent." on the capital stock of the company, such dividends to be paid July 1 and July 15, 1892, respectively; and, on the nineteenth of June, 1895, they declared "a stock dividend of twenty-five per cent.," by preamble and resolution, in the following words: "Whereas, a large amount of the

net earnings of the company has been used in making permanent betterments and additions to its plant, and such profits have been withheld from the stockholders for that purpose, instead of distributing them among the stockholders as dividends; and, whereas, there has been accumulated and permanently added to the value of the assets and capital of the company more than twenty-five per cent. of the amount of the present capital stock; therefore, be it resolved, that a stock dividend of twenty-five per cent. be declared payable, and distributed on July 1, 1895, among the stockholders of the company of record of that date, in proportion to their holdings."

The first two dividends, like the third one, were declared from the "net earnings" or "profits" of the company, and each of the three dividends was based, entirely, upon "net earnings" or "profits" made after the death of the testator. The cash dividend upon the $25,000 of stock, set apart for the beneficiaries of the second item of the will, was paid to the widow, and the two stock dividends thereon were turned over to the Nashville Trust Company, which held the $25,000 of original stock, as trustee. The first of the stock dividends amounted to $2,500, being ten per cent. on $25,000, and the second one amounted to $6,875, being twenty-five per cent. on $27,500 ($25,000 plus $2,500), the amount of the original stock with first stock dividend added. The two stock dividends aggregated $9,375, and the certificates, or shares, issued therefor constitute the

subject-matter of the present litigation.   The widow claims to own those certificates, or shares, absolutely as a part of the income of the $25,000 of stock bequeathed to her for life, and the remaindermen claim to own them as capital, and say that she is entitled only to receive cash dividends thereon, as on the $25,000 of original stock.   In view of this controversy, the Nashville Trust Company refused to surrender the stock dividends to the widow, and, upon that refusal, she brought this suit in equity against all proper parties.   The Chancellor ruled in favor of the remaindermen, and decreed "that said two stock dividends go to the *corpus*, and that the life tenant will be entitled to all cash dividends upon the stock thus increased."   The Court of Chancery Appeals reversed the decree of the Chancellor, and adjudged the stock dividends to be the absolute property of the life tenant, as a part of the income of her life estate in the original stock.

The precise question is this: Which of the two, the life tenant or the remainderman, of corporate stock bequeathed, is the ultimate owner of stock dividends, declared from net earnings, made after the respective rights of the two persons attached to the original stock?   Do such dividends belong, absolutely, to the life tenant as income, or do they form a part of the *corpus*, and pass to the remainderman as such?

This question, in one form and another, has perplexed the Courts for a century, and numerous ad-

judged cases are found in support of either view. The learned Chancellor followed one line of decisions, and the learned Court of Chancery Appeals followed the other, both recognizing the irreconcilable conflict of authority.

This case, as we believe, is relieved of much difficulty when it is considered that the controversy is solely between the life tenant and the remaindermen, and that no prerogative of the gaslight company is involved. The question is one of ownership merely, and concerns only those claimants. The corporation is not a party to the suit, and cannot be affected by the result.

If the purpose of the bill were to compel the corporation to undo what it has done, and disburse in cash the net earnings represented by the two stock dividends, instead of using them to increase its capital stock, the complainant would have no standing in court, for a corporation, so long as it acts in good faith and within its charter powers (and there is no claim that this corporation has done otherwise), is rightfully allowed to decide such matters for itself without let or hindrance from any source.

Undoubtedly the action of the gaslight company, in converting net earnings into capital stock, gave them that character and status for all corporate purposes. But did it have any legal effect beyond that? Does it follow that they were converted into technical *corpus*, as between the life tenant and the

remaindermen owning a portion of the original stock? We think not.

When property is given to one person for life, with remainder to another, the former is entitled to the use for the period limited, and the latter to the *corpus* after that time. Neither may encroach upon the right of the other. The life tenant may not diminish the *corpus* nor the remainderman the use, and what they may not do themselves, others may not do for them. The life tenant may not be deprived of the use to augment the *corpus*, nor the remainderman of the *corpus* to augment the use. The right to the use of the property entitles the life tenant to its net income. As applied to land, it entitles him to the crops or rent; as applied to money or bonds, it entitles him to the interest; and as applied to corporate stock, it should, upon the same reasoning, entitle him to the net earnings. If the life tenant may not be deprived of crops or rents to make the land better, or of interest to enlarge the *corpus* of money or bonds, why should he be deprived of net earnings of corporate stock, covered by stock dividends, to augment the remainder estate? It does not seem to us a sufficient answer to say that the corporation, in the latter case, has seen fit, in the due exercise of its power, to capitalize such earnings, rather than pay them out in cash dividends. What has the capitalization of the earnings to do with their ownership as between life tenant and remainderman, or how can the change of

form affect the title of those persons? Can the corporation, after earnings have been made and ascertained, give them to one person by this procedure or to another by that procedure? Certainly not. Though endowed with the largest discretion in the honest management of its business, and allowed at pleasure to convert its net earnings into capital stock through the medium of stock dividends, a corporation cannot, by that act, in our opinion, turn any portion of those earnings from the life tenant to the remainderman of original stock.

The life tenant of corporate stock is entitled to the undiminished benefit of its net earnings in any and every contingency; less than that would not allow him the full use of the life estate. He has at least an inchoate interest and title in and to such earnings from the inception of his estate, and that interest and title reaches full maturity and becomes absolute when the corporation sees fit, in the course of its affairs, to cover those earnings by dividends, in whatever form. If the dividends be paid in cash, he takes that; and if in stock, he takes that.

Why should not this be so? It is certainly just to the persons interested, and fair to the corporation. By it the prior rights of the former are not altered, the business processes of the latter are not interrupted. The remainderman was entitled, in the first instance, to the enjoyment of the *corpus* of the original stock in due season. He is still entitled to that

without diminution, and the life tenant has only the net earnings.

The testator did not disclose any specific intention in respect of the particular matter involved in this controversy. He did not even mention the $25,000 of corporate stocks or the dividends to accrue thereon. Nevertheless, it is conceded that he disposed of both, and we think it hardly to be doubted that the disposition herein indicated is the one in accord with his general intention.

He employed the most general terms to create a life estate with remainder over, disposing of both real estate and personal property in the same sentence, by the same words, and without condition or qualification. The measure of the life tenant's interest in the realty devised is the same as that of her interest in the personalty bequeathed, and *vice versa*. Nothing is excepted, nothing reserved from either. It follows, as a matter of law, that she is entitled to the full use of each, according to its nature, so long as she may live, and no impairment of that use should be sanctioned by the Courts in the one case or the other. Present enjoyment is the very essence of a life estate; without it, the gift would be meaningless and worthless.

Special words were not necessary to vest the life tenant in this case with a right to stock dividends. The general bequest had that effect. Special words would have been necessary to deprive her of them,

just as special words would have been required to deprive her of income on realty devised.

Had the testator lived, these stock dividends would, unquestionably, have been income to him upon his investment in the original shares; having died, they were, for the same reason, income to his estate, as owner of the same investment. The income of that part of his estate, during her life, was bequeathed to his widow; hence, she, as life tenant, became the owner of these dividends in as full a sense as he would have owned them.

Notwithstanding the impossibility of harmonizing the conflicting decisions upon any common ground, so as to discover an agreed principle upon which to rest this case, it may be well to mention some of the leading authorities.

The earlier English cases seem to have turned upon the question as to whether the controverted dividend was usual and ordinary or unusual and extraordinary. If the former, it was given to the life tenant; if the latter, to the remainderman. The earliest of those cases is that of *Brander* v. *Brander*, 4 Ves., 800, decided in 1799. It there appeared that the Bank of England had paid out £1,000,000 for the public service, and received therefor £1,125,-000 five per cent. annuities, which annuities were, by resolution of the bank, divided proportionately among the proprietors of the stock of the bank. Of the annuities so divided, £1,000 were assigned to stock bequeathed to one person for life, with re-

mainder to another.    The Lord Chancellor adjudged
the annuities to be "an accession to the capital,"
and allowed the life tenant only "the benefit of the
dividends" thereon.    *Ib.*, 801, 802.    That case was
soon followed by *Irvine* v. *Houston*, 4 Paton, Sc.
App., 521.    The English Judges themselves confess
much difficulty in discovering "the principle" upon
which those decisions were made.    *Paris* v. *Paris*,
10 Ves., 189; *Bouch* v. *Sproule*, 12 App. Cas., 393.

In *Paris* v. *Paris*, *supra*, the Bank of England
declared two cash dividends in the same month—one
for £3 10s. per cent., and the other for £5 per
cent.—upon the capital stock of the bank.    The first
dividend was the usual and ordinary one for the
half year; the second was unusual and extraordinary,
although made from a part of the same profits.
The latter, because unusual and extraordinary, was,
by the Court, considered as capital, and not the ab-
solute property of the tenant for life.    It was sug-
gested in argument that there was an important dif-
ference between dividends in stock and dividends in
cash, and, therefore, that the case in hand should
not be controlled by the ruling in *Brander* v.
*Brander*, *supra*, and *Irvine* v. *Houston*, *supra*.

To this suggestion, Lord Eldon replied: "As to
the distinction between stock and money, that is too
thin; and, if the law is that this extraordinary
profit, if given in the shape of stock, shall be con-
sidered capital, it must be capital if given as money."
10 Ves., 190.

31—13 P

In *Bouch* v. *Sproule, supra,* decided in 1887, the Consett Iron Company, limited, was shown to have accumulated a large ''reserve fund'' and an ''undivided profit fund,'' from which, combined, it declared ''a bonus dividend,'' which, according to the company's scheme, the holders of existing shares invested in new shares, issued concurrently with the payment of the dividend. The estate of William Bouch owned six hundred of the existing shares, and, by the process mentioned, became the owner of two hundred new ones. The six hundred existing shares had been bequeathed to the widow of William Bouch for life, with remainder over. After her death, a controversy arose between her executor and the remainderman as to the ownership of the two hundred new shares. The case finally reached the House of Lords, and was there decided against the estate of the tenant for life. Lord Herschell, though confessing the question to be one ''of very considerable difficulty,'' after reviewing prior decisions, said: ''I quite agree with the Court below, that, apart from the authorities to which I have alluded, the general principle for the determination of such a question as that before us, and, in my opinion, the only sound principle, is that which is well expressed in the judgment of Lord Justice Fry: 'When a testator or settlor directs or permits the subject of his disposition to remain as shares or stocks in a company which has the power either of distributing its profits as dividend or of converting them into capital, and the

company validly exercises this power, such exercise
of its power is binding on all persons interested,
under the testator or settlor, in the shares, and,
consequently, what is paid by the company as div-
idend goes to the tenant for life, and what is paid
by the company to the shareholder, as capital, or
appropriated as an increase of the capital stock in
the concern, inures to the benefit of all who are
interested in the capital.'" And, finally, interpreting
the transaction out of which the new shares arose,
he added: 'Upon the whole, then, I am of opinion
that the company did not pay, or intend to pay,
any sum as dividends, but intended to, and did, ap-
propriate the undivided profits dealt with as an in-
crease of the capital stock of the concern.'" 12
App. Cas., 397–399.

We entirely agree that the authorized action of
the company in respect to the disposition of its
profits "is binding on all persons interested" in its
shares, but are unable to see that it follows, as a
consequence, that the tenant for life does not own
new shares paid for with capitalized profits of his
or her estate. The company must have full liberty
in the conduct of its own affairs; hence all persons
interested are bound by its authorized action. But
the company does not intend to say, by an increase
of capital from profits, that the new shares shall be-
long to the remainderman as *corpus* rather than to
the life tenant as income. It has no possible inter-
est in that question, and no power, in our opinion,

to control or influence title and ownership. Beyond the matter of corporate policy and expediency, the power of the company does not extend.

The latest of the numerous English cases examined by us was decided in 1890. In that case the Kempton Park Race Course Company, limited, declared and paid in money a "dividend," a "bonus," a "special bonus," and an "interim dividend," partly from yearly profits and partly from "reserve fund." The Court adjudged the names of the distributions and the fact that they were made partly from "reserve fund," to be wholly unimportant, and gave the life tenants that part of the whole amount divided which was apportioned to the shares settled upon them. *In re Alsbury, Sugden* v. *Alsbury*, 45 Ch. Div., 237. This case affirmed the soundness of the decision in *Bouch* v. *Sproule, supra*, upon its own facts, but the two cases were distinguished upon the ground that the profits of the company had actually been capitalized in the one case and not in the other.

The American adjudications may be ranged in two lines—one favorable to the remainderman and the other favorable to the life tenant. The leading, though not the oldest, case of the former line, is that *Minot* v. *Paine*, 99 Mass., 101, which is headnoted as follows: "If a fund held in trust to pay the income to one until his death, and then convey the capital to another, includes shares in the stock of a corporation, shares

of additional stock distributed to the trustees as a lawful dividend thereon, accrue as capital, although they represent net earnings of the corporation." In the course of the opinion it was observed: "The Court do not regard the fact that the dividends were made from the net earnings of the roads as material." And again: "A simple rule is to regard cash dividends, however large, as income, and stock dividends, however made, as capital." 99 Mass., 106 and 108.

Undoubtedly the rule thus suggested possesses the merit of being plain and easily applied, yet it may, in some cases, be an instrument of great injustice. We think its application will do injustice in every instance where net earnings accruing after the creation of the trust estate are converted into stock dividends, or original capital into cash dividends, since, in our opinion, such earnings, whenever distributed, in stock or cash, belong, absolutely, to the life tenant, and such capital, whenever returned in the form of cash dividends, belongs to the remainderman. The former course is frequently pursued, the latter now and then. A forcible illustration of the injustice of the rule in the latter view, is found in the .case of *Heard* v. *Eldredge*, decided four years later by the same Court and in an opinion by the same learned Judge. Its injustice, as applied to the facts of that case, was recognized, and the dividend, though in cash, was denied the life tenant and given to the remainderman, as should have been done. The head-

note, which sufficiently states the decision, is: "Money paid to compensate a corporation, whose property consisted of a wharf and dock, for part of its real estate taken by right of eminent domain, if distributed as a dividend to the shareholders, belongs to the capital and not to income of a trust fund invested in the shares." 109 Mass., 258.

*Rand* v. *Hubbell*, 115 Mass., 461, is very similar in its facts to the English case of *Bouch* v. *Sproule*, *supra*, there being a cash dividend from net earnings and a concurrent issue of new shares therefor in each case. The result reached in both is the same. In this one the Court said: "When a distribution of such earnings is made by the corporation among its shareholders, the question whether such distribution is an apportionment of additional stock, or a division of profits, depends upon the substance and intent of the action of the corporation, as shown by its votes." 115 Mass., 474.

Practically the same rule as that announced in *Minot* v. *Paine*, *supra*, seems to prevail in Maine (*Richardson* v. *Richardson*, 75 Me., 570; S. C., 46 Am. R., 430), in Rhode Island (Petition of Brown & Larned, 14 R. I., 371; S. C., 51 Am. R., 397), in Connecticut (*Brinley* v. *Grove*, 50 Conn., 66; *Spooner* v. *Phillips*, 16 L. R. A., 461), and in Georgia by statute. *Millen* v. *Guerrard*, 67 Ga., 292 (S. C., 44 Am. R., 720).

The principle stated by Lord Herschell in *Bouch* v. *Sproule*, *supra*, and quoted herein, met the ap-

proval of the Court of Appeals of New York in *Matter of Kernochan*, 104 N. Y., 629, 630.

One of the most instructive cases of this line, and that which has caused us much hesitation on account of its high authority, is *Gibbons* v. *Mahon*, 136 U. S., 549. Mrs. Smith bequeathed two hundred and eighty shares of stock in the Washington Gaslight Company, in trust, with direction that "the dividends" accruing thereon be paid to her daughter, Mary Ann Gibbons, "during her lifetime, without percentage of commission or diminution of principal," and that, upon her death, the shares go to her other daughter, Mrs. Mahon. The total stock of the company was $500,000 when the testatrix died. It was subsequently increased, by authority of Congress, to $1,-000,000, and new shares were issued for the old ones, and for the increase. The trustee accordingly received five hundred and sixty new shares. The increase of capital stock was made entirely from "net earnings, income, and profits" of the company, accruing and invested partly before and partly after the death of the testatrix. The life tenant was held to be entitled to the dividends on the whole five hundred and sixty shares, and nothing more. A transfer of the two hundred and eighty shares, representing increased capital, was refused her. Mr. Justice Gray, who delivered the opinion of the Court, among other things, said: "Money earned by a corporation remains the property of the corporation, and does not become the property of the stockholders,

unless and until it is distributed among them by the corporation. The corporation may treat it and deal with it either as profits of its business or as an addition to its capital. Acting in good faith, and for the best interests of all concerned, the corporation may distribute its earnings at once to the stockholders as income, or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years, or it may retain portions of its earnings, and allow them to accumulate, and then invest them in its own works and plant, so as to secure and increase the permanent value of its property. Which of these courses shall be. pursued is to be determined by the directors, with due regard to the condition of the company's property and affairs as a whole, and, unless in case of fraud or bad faith on their part, their discretion in this respect cannot be controlled by the Courts. Reserved and accumulated earnings, so long as they are held and invested by the corporation, being part of its corporate property, *it follows that the interest therein, represented by each share, is capital, and not income, of that share, as between the tenant for life and the remainderman, legal or equitable, thereof.*'' Page 558.

Though concurring in all that goes before, we dissent from the conclusion expressed in the lines we have italicised. That seems to us to be a *non sequitur.* There can be no doubt that reserved and accumulated earnings, held and invested by the cor-

poration, are corporate property; nevertheless, we are unable to see how that fact determines or affects the question of interest therein as between life tenant and remainderman of shares. Those persons acquire their interests under the will or deed, and not through any action of the corporation.

The learned justice said further: "A stock dividend really takes nothing from the property of the corporation, and adds nothing to the interests of the shareholders. Its property is not diminished, and their interests are not increased. After such a dividend, as before, the corporation has the title in all the corporate property, the aggregate interests therein of all the shareholders are represented by the whole number of shares, and the proportional interest of each shareholder remains the same. The only change is in the evidence which represents that interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of the new ones." Page 559.

Obviously this change "in the evidence" of the shareholder's interest separates his income on the investment from his capital invested, the new shares representing his income and the old ones his capital, and it would seem that a separation of the combined interests of life tenant and remainderman is wrought by the same process, the new shares standing for income of the trust estate and the old ones for its capital, at least to the extent that the new capitali-

zation includes net earnings made since the trust took effect. The trustee has made no new investment. He has only received new shares representing profits of the investment made by the founder of the trust. How can the facts that net earnings are made capital to the company, and that the issuance of stock dividends thereon do not diminish corporate property, prevent such dividends from being income to the holder of old shares, whether that holder be absolute owner or only tenant for life?

The leading case of the other line is *Earp's Appeal*, 28 Penn. St., 368. It there appeared that a stock company had issued new stock upon a large "surplus fund," accumulated from the profits of its business, through a period of years partly before and partly after the death of the testator, and it was decided that life tenants of 540 shares of old stock were entitled, as absolute owners, to such portion of the certificates of new shares as represented profits accumulated after the death of the testator, but not to that portion representing profits accumulated before his death. In the opinion the Court observed: "In the case before us the testator has not made a bequest of the stock itself to the appellants. On the contrary, he has given them only the 'income' of it for life. Their interests commenced after the death of the testator. They have no right whatever to claim the 'income' which had accumulated before his death. If they may go back of that event, for a single day, to seize upon 'income, rents,

or interest,' which had accumulated in his lifetime, they may ransack the transactions of his whole life, and end by showing that his whole fortune consisted of 'rents, interest, and income,' arising from a very small capital, which has since been lost. It is equally clear that the profits arising since the death of the testator are 'income'. within the meaning of the will, and should be distributed among the appellants. These profits amounted, at the time of the issue of new certificates of stock, to the sum of $40,-500, exclusive of the current semiannual dividends which had been previously declared and paid. That sum is the rightful property of the appellants. The managers might withhold the distribution of it for a time, for reasons beneficial to the interests of the parties entitled. But they could not, by any form of procedure whatever, deprive the owners of it and give it to others not entitled. The omission to distribute it semiannually, as it accumulated, makes no change in its ownership. The distribution of it among the stockholders in the form of new certificates has no effect whatever upon the equitable right to it.'' 28 Penn. St., 374.

The controlling principles underlying this decision have been recognized in other cases in the same State (*Wiltbank's Appeal*, 64 Penn. St., 256; *Biddle's Appeal*, 99 Penn. St., 282; *Vinton's Appeal*, *Ib.*, 440; *Smith's Estate*, 140 Penn. St., 344). Also in Kentucky (*Hite* v. *Hite*, 93 Ky., 257; S. C., 40 Am. St. R., 189), in Maryland (*Thomas* v. *Gregg*,

78 Md., 545; S. C., 44 Am. St. R., 310), in New Hampshire (*Lord* v. *Brooks*, 52 N. H., 72; *Pierce* v. *Burroughs*, 58 N. H., 302), in New Jersey (*Van-Doren* v. *Olden*, 19 N. J. Eq., 176; S. C., 97 Am. Dec., 650; *Ashurst* v. *Field*, 26 N. J. Eq., 11; *VanBlarcom* v. *Dager*, 31 N. J. Eq., 793), and in South Carolina (*Cobb* v. *Flint*, 14 S. E. R., 959).

In the Kentucky case, which was decided in 1892, the Court said: "Since the testator's death, certain stock dividends, based upon earnings and profits, have been declared upon some of the stocks. It is claimed by the remaindermen that they belong to the principal of the estate, while the life tenants assert they are entitled to them as income. The question is beset with difficulties. It is urged by the former that the mere declaration as 'a stock dividend' by the company is conculsive in their favor; that, being stock, it must be treated as a part of the capital, and that the conclusion of the company to turn all their profits into capital is a matter in its discretion, and conclusive upon the Courts. As between the company and the shareholder, the action of the directors in determining whether the earnings shall be capitalized in stock dividends or paid out in cash, is conclusive; but, when once declared, although in the form of stock, .it is the province of the law to determine whether they belong to the *corpus* of an estate, and are to benefit the remainderman, or whether they shall go

to the life tenant as income.  .  .  .  Where a dividend, although declared in stock, is based upon the earnings of the company, it is in reality, whether called by one name or another, the income of the capital invested in it. It is but a mode of distributing the profit. If it be not income, what is it? If it is, then it is rightfully and equitably the property of the life tenant. If it be really profit, then, he should have it, whether paid in stock or money." 93 Ky., 264, 265, 266.

It should be noted that it is stated in another part of this opinion, page 265, contrary to the rule announced in *Earp's Appeal*, that "dividends, whether of stock or payable in money, are nonapportionable, and must be considered as accruing in their entirety as of the date when they are declared." Otherwise, the two cases are in full accord.

The Maryland case is the latest one we have seen, having been decided in 1894. As well presented in the syllabus, it is as follows: "A testator bequeathed, in trust, for the sole and separate use and benefit of his daughters during their lives, and, at their death, to their issue, stock in a railroad company, which, after the death of the testator, which occurred on February 11, 1890, passed a resolution reciting that, for the three fiscal years ending September 30, 1891, the net earnings of the company had amounted to a specified sum; that they had been used, among other things, for the permanent im-

provement of the railway, and for new construction, and that, therefore, a dividend of twenty per cent. be declared for said period, 'payable in common stock of the company.' Held, that the dividend was income, and not capital, and the daughters were entitled to that earned after the death of the testator." 78 Maryland, 545.

Most of the late text-writers who have considered the subject lend the weight of their approval to the rule laid down in the case of *Earp's Appeal, supra,* some of them characterizing it as the Pennsylvania or American rule, as contradistinguished from the rule of *Minot* v. *Paine,* 99 Mass., 101, which is sometimes called the Massachusetts rule. 1 Morawetz on Pri. Corp., § 468; 1 Spelling on Pri. Corp., § 457, note 2; 1 Cook S. & S., § 554; 2 Beach on Pri. Corp., § 600; 2 Thomp. on Corp., § 2192.

Mr. Thompson says, in the section cited, that, "instead of attempting to lay down a hard and fast rule on the subject which shall be applicable to all cases—and herein lies the chief mistake which the Courts have made in dealing with it—it should be determined upon the consideration of the actual nature of the dividend in each particular case."

We understand that what is called the Pennsylvania rule requires a "consideration of the actual nature of the dividend in each particular case," and, hence, that this author, by this language, approves that rule. In criticism of the Massachusetts rule, he says: "The Massachusetts doctrine seems to be

a rule of mere convenience, and not a rule of justice.    It loses sight of the real question under consideration—what is capital of the estate disposed of by the will? and not what is capital of the corporation—and it goes entirely beyond tenable ground when it allows this question to be determined, not by the judicial Courts upon a view of the real substance of the case, but by a board of directors— that is, by a committee of persons entirely foreign to the will, in passing a resolution declaring a dividend." *Ib.*, § 2222.

Affirm the decree of the Court of Chancery Appeals, and direct the delivery of the stock dividends to the complainant.