SAMUEL D. SMITH, TRUSTEE, vs. C. BATES DANA ET AL.

First Judicial District, Hartford, January Term, 1905.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

As a general rule cash dividends upon corporate stock are to be re-
garded as income and therefore pass to the life tenant, while stock
dividends will be treated as capital and go to the legatee in re-
mainder.

Although this rule may not work exact justice under all circumstances,
it is much more likely on the whole to lead to just and equitable
conclusions than any attempt to go behind the action of the di-
rectors in each case in tracing financial results to their source, and
in a search for precise or theoretical equities,—a judicial under-
taking which must necessarily resolve itself into mere speculation
and guess work, and one which the rule was designed to forestall.

Moreover such an attempt would in most cases prove fruitless, since
directors, acting in good faith, have discretionary power to deter-
mine at all times, within reasonable limits, the destiny of profits,
and of accumulated profits represented by surplus.

Undistributed profits, or surplus in any form, may be invested or em-
ployed in the business of the corporation without thereby becom-
ing "capital" within the meaning of that term as used in the
foregoing rule; and until such profits are effectually and irrevoca-
bly dedicated to corporate uses through the processes of a stock
dividend, they do not pass beyond the control of the directors nor
cease to be available for distribution to those to whom they might
have been originally allotted as cash dividends.

Nor is there any reason in justice why such use of profits should enure
to the benefit of the remainderman rather than the life tenant,
where the profits so employed for a time have finally been con-
verted into money and made payable to stockholders in the form
of a cash dividend.

Such a transaction by a solvent and prosperous corporation is in no
proper sense a liquidation or surrender of a portion of its capital.

Argued January 3d—decided March 9th, 1905.

ACTION of interpleader to determine the rights of adverse
claimants to a sum of money received by the plaintiff as a
dividend upon stocks held by him in trust, brought to the
Superior Court in Hartford County and tried to the court,
*George W. Wheeler, J.;* facts found and judgment rendered,

from which all the claimants appealed. *Error and judgment reversed.*

*Charles Welles Gross*, for the plaintiff.

*Charles E. Gross*, for the appellant I. C. Bates Dana (defendant).

*Grosvenor Calkins* of Boston, for the appellants W. S. B. Dana *et al.* (defendants).

*Edward I. Baker* of Boston, for the appellants C. Bates Dana and Gertrude M. Steele (defendants).

PRENTICE, J. The will of Alfred Smith who died in Hartford, the place of his residence, on August 12th, 1868, was on August 16th following admitted to probate in the Court of Probate for the district of Hartford. By the will the testator gave to trustees the sum of $100,000. By the terms of the trust the trustees were required to pay over the income to certain persons designated, during the lives of three grandchildren and the survivor of them, and upon the death of the last survivor to divide and distribute the *corpus* in the manner provided. Each of the three grandchildren was made the beneficiary of a share of said income during his life. The defendant I. C. Bates Dana is the only one of them surviving. Certain of the other defendants are his children and the husband of one of them. The remaining defendants are the children of Alfred F. Dana, another of said grandchildren. The third died childless. It is assumed and conceded by all parties that these defendants embrace all who under the provisions of the will are or can become entitled to share in the income of the trust estate, and all who are or can become entitled to participate in the division of the *corpus* upon the termination of the trust to pay over income, unless it be persons representing them or hereafter born children of said Bates Dana. The children of Alfred occupy the position of both life ten-

ants and remaindermen. The claim which they here assert is made in the former capacity.

The will provided that in setting apart said trust fund of $100,000, there should be included therein three hundred shares of the stock of the Holyoke Water Power Company which the testator owned, the same to be taken for that purpose at their par value. That was done. The capital stock of said corporation was then $350,000. July, 1877, said capital was increased to $600,000 by the issue of new stock subscribed and paid for at par. The right to subscribe for this new issue was accorded to existing stockholders *pro rata*. The trustees sold the rights attaching to said three hundred shares. In 1893 the capital stock was again increased to $1,200,000, in the same manner as before. At this time the trustees subscribed for and took two hundred shares, making their trust holdings five hundred shares, and sold the remaining rights. December 20th, 1902, the directors declared a cash dividend of sixty-five per cent., payable December 24th to stockholders of record December 20th. The plaintiff, who is the only survivor of the trustees, received the sum of $32,500 as the amount of said dividend upon said five hundred shares. This sum he now holds. The defendants Bates Dana and the children of Alfred Dana claim the whole thereof, as income to which they are entitled. The children of Bates Dana claim that the whole, or at least the bulk of said sum, belongs to the *corpus* of the trust estate, and should be held by the trustee as an accretion thereto. The trial court sustained this claim with respect to approximately two thirds of the dividend, and adjudged that the balance be divided as income.

This conclusion and the reasons which the court gave in support of it, as well as those which counsel for said children of Bates Dana urge in support of their broader contention, require for their understanding and examination a statement of some of the facts which enter into the history of the corporation in question, and which serve to indicate the source and character of the corporate assets which formed the basis of the sixty-five per cent. dividend.

Previous to 1859 the Hadley Falls Company, a Massachusetts corporation, had acquired a large tract of land where the city of Holyoke is now located, and had constructed a dam across the Connecticut River, extending from South Hadley on the northeasterly shore to Holyoke on the southwesterly shore, and had built locks and canals at Holyoke, and had laid out streets, sites for manufactories, tenements and residences, and several factories, residences, and other buildings had been erected. Among other buildings, said Hadley Falls Company had constructed a small gas plant which it operated. Subsequently said company went into a receiver's hands, and the Holyoke Water Power Company, hereinafter referred to as the Holyoke Company, was in 1859 organized with a capital stock of $350,000 to purchase and take over said property of said Hadley Falls Company. The purchase was made, the entire capital of the Holyoke Company being paid as the consideration therefor. The purposes of the Holyoke Company, as defined in the Act creating it, were of "upholding and maintaining the dam across the Connecticut River heretofore constructed by the Hadley Falls Company, and one or more locks and canals in connection with the said dam, and of creating and maintaining a water-power to be used by said corporation for manufacturing and mechanical purposes, and to be sold or leased to other persons or corporations to be used for like purposes." The charter gave the corporation "full power and authority to purchase, take, hold, receive, sell, lease and dispose of all or any part of the estate, real, personal or mixed, with all the water-power, water-courses, water-privileges, dams, canals, rights, easements and appurtenances thereto pertaining or belonging, or therewith connected, or which have at any time heretofore belonged unto or been the property of the said Hadley Falls Company, and any other real estate that may be required for the use of said corporation for the purposes contemplated by this act."

The Holyoke Company continued the manufacture, sale and distribution of gas by the usual means and methods, to supply the needs of the growing community which came

into existence upon the site of its property and which in time became the city of Holyoke, without other authority therefor than was contained in those portions of the charter recited, until 1873, when special legislative authority was obtained. In 1880 the company was—as required by law of all persons engaged in the generation and sale of electricity—duly authorized to engage in that business by an order of the board of gas commissioners. From that date down to December, 1902, it generated electricity for sale and distribution, erecting and maintaining a plant for that purpose.

As the result of proceedings instituted under the provisions of chapter 370 of the Acts of the legislature of Massachusetts of the year 1891, which are in the main similar to those in force in this State regulating the establishment of gas and electric plants by municipalities within which there are existing public-service plants of that character owned by private corporations, the city of Holyoke on December 15th, 1902, acquired both the gas and electric plants of the Holyoke Company, paying therefor the sum fixed by the commission appointed for that purpose by the court under the provisions of said Act. Upon such acquisition, the right of the Holyoke Company to engage in the business of manufacturing and distributing gas or electricity ceased by virtue of the provisions of said Act.

The amount so paid by said city to said company was $721,043. By the use of said sum and other moneys of the corporation on hand—which at the time did not exceed $150,000 in amount—the dividend in question, requiring the disbursement of $780,000, was paid.

The actual cost to the company of the electric-light plant was $243,776.34.

Previous to the declaration of said dividend of sixty-five per cent., the market value of the shares of said company was from $380 to $385 per share. At the time of its declaration the company held real and personal property amounting in value to more than $4,000,000 over and above all of its obligations. At the date of the commencement of

this action the market value of the shares of the company, as evidenced by the sale of a few shares of said stock, appeared to be from $315 to $325 per share.

All sums derived from the issue of stock have gone into the general treasury and there become mingled with the other funds of the company. No separation of funds has been made, and it is impossible to trace the funds derived from any one source so as to follow them into any distinct investments.

For many years the company has paid regular dividends of ten per cent. per annum. Between February 1st, 1899, and January 15th, 1901, it paid extra dividends amounting to ninety per cent. of the capital stock.

The present contention between those who stand in the relation of life tenants and remaindermen to trust funds invested in stocks, presents the oft recurring question as to the rights of persons occupying those relations to participate in the benefits of a distribution to stockholders of the assets, or some portion of the assets, of the corporation. In the present case a solvent and going corporation whose capital was undergoing no reduction in amount, declared a dividend payable and paid in cash. Life tenants of stock held in trust claim to be entitled to the dividend payment as income. Remaindermen claim that it should go to augment the capital account of the trust estate. In *Minot* v. *Paine*, 99 Mass. 101, the necessity of some plain and simple rule which in situations like the present, frequently arising, should serve to guide trustees in the discharge of their duties and *cestuis que trustent* in the determination of their rights, without a resort to harassing and expensive litigation, was expressed, and such a rule formulated. This rule made the character of the dividend the test. Cash dividends it was said should be regarded as income, and stock dividends capital. It was not pretended that this rule, which has been commonly known as the Massachusetts rule, was the ideal rule of reason; nor have the courts of high authority which have given their approval of it ever claimed it to be such, or one which would accomplish exact justice under all

circumstances. What has been claimed for it is that its general application, at least if due regard be had for the substance and intent of the transaction, would prove more beneficient in its consequences, and on the whole lead to results more closely approximating to what was just and equitable, than would the application of any other rule or any attempt to go behind the declaration of the dividend to search out and discover the equities of each case according to some theoretical ideal. *Gibbons* v. *Mahon*, 136 U. S. 549; *Richardson* v. *Richardson*, 75 Me. 570; *Rand* v. *Hubbell*, 115 Mass. 461; *D'Ooge* v. *Leeds*, 176 id. 558; *Lyman* v. *Pratt*, 183 id. 58, 61. The necessity for a rule which should serve as a guide and protection to trustees in the performance of their duties is apparent. The advantages of one which would make ceaseless litigation, with its attendant harassment and expense, unnecessary, are no less so. The uncertainty and difficulties attending any attempt at arriving at the true equities between parties respectively asserting income and capital interests, in the proceeds of a dividend declared, are not so readily appreciated. It requires, however, but slight reflection to discover the magnitude of the obstacles to be surmounted and the impossibility which must oftentimes be met, whereby the judicial search for precise equities necessarily becomes resolved into a speculation and a guess. There exists the ever-present difficulty of tracing financial results to their source, and of distinguishing between what of increased assets rightfully represents profits, and what represents increase of value appropriate to capital. Above all, there enters into most situations to render courts powerless to arrive at any certain results, a controlling factor arising from the discretionary power which directors rightfully exercise to determine at all times, within reasonable limits, the destiny of profits and of accumulated profits represented by surplus. *Gibbons* v. *Mahon*, 136 U. S. 549. Profits may be distributed as earned. They may be in whole or part retained and utilized for the corporate advantage. They may be used for a time and later distributed. They may never be distributed, but permanently used in the

business. Whether they will enure to the benefit of stockholders in the way of a dividend may ever remain uncertain. Whether in the ordinary course they will fall to the lot of the life tenant as profits declared, or remain to enhance the value of the stock, will depend in part upon the action of the directorate and in part upon the term of the trust. They, as we shall have occasion to notice later on, can never acquire a status which must remain a fixed and abiding one, unless they are formally capitalized. Their future is ever an uncertain one, and none save one who can foretell the action of boards of directors can discover it. The rights of stockholders are involved in this maze of doubt. Fixed rights there are not. Rights which are superior to those which may at any time be created by corporate management may not exist. In the presence of such conditions, courts must oftentimes find themselves powerless to ascertain and determine rights, since there may be nothing which lies without the domain of conjecture to act upon. The more the matter is studied the more apparent it becomes that the Maine court, speaking of the Massachusetts rule through Chief Justice Peters, was justified in its expression : " We are satisfied that this can be the only safe, sound, just and practicable rule, and that any attempt to engraft refined and nice distinctions upon such rule will be productive of much more evil than any good that can come from it." *Richardson* v. *Richardson*, 75 Me. 570, 574.

This court has heretofore given its adhesion to the doctrine of *Minot* v. *Paine*, 99 Mass. 101, as the one to be ordinarily applied. *Mills* v. *Britton*, 64 Conn. 4; *Brinley* v. *Grou*, 50 id. 66.

An application of this principle would, *prima facie* at least, quickly resolve the present contention in favor of the life tenants. The trial court, however, has regarded the rule, as it has been adopted in this jurisdiction at least, as a decidedly flexible one. The logical conclusion of the position taken in its exhaustive memorandum of decision, although not stated in precise terms, is that the rule is such a tentative one that it will yield where it appears upon in-

Smith v. Dana.

quiry that justice will not be accomplished by it. Starting with this premise the court arrived at the conclusion that in this case justice would not be done by its application, and the rule was therefore disregarded. An inquiry was then made into the sources of the funds out of which the dividend was paid, to discover what was conceived to be the true nature of the transaction and the real equities of the parties claimant. The court thus arrived at three vital conclusions which dictated the judgment as rendered, to wit: (1) that the accepted general rule must yield where it fails to accomplish just and equitable results; (2) that such results would not be reached in this case by its application; and (3) that the results established by the judgment were just and equitable ones.

Let us first consider the last two of these conclusions, since they furnish the key to the court's action. It is said that the operation of the rule would be inequitable because it would, under the circumstances, result in the diversion to the life tenants, under the guise of income, of that which of right belongs to the stock as capital and therefore the remainderman's. It is said that the distribution made by the court is equitable, because it prevents that diversion and gives the remaindermen what is equitably theirs, and that only. The same conception underlies both conclusions. They are, however, reached upon mistaken premises. These mistaken premises arise from a failure to properly distinguish between the different qualities which attach to the various assets of a private corporation, and between the different characters which these assets may assume.

A citation from the memorandum of decision will indicate the nature of the misconception which lies at the foundation of the trial court's argument and position, to wit: "All of the subject-matter of these awards was property appropriated to the uses of these plants, and hence permanently made a part of the capital of the company. . . . Corporate profits undistributed belong to the corporation. . . . When such profits are expended upon the property of the corporation used in its business, or devoted to the acquisition of

new property, or to the creation of a new business, these constitute a permanent addition to capital beyond the recall of the directors. Once capital always capital. It makes no difference whether such augmentation of capital resulted from the proceeds of increase of stock or from profits appropriated to capital; it is the thing done with the funds which determines. Did it go to the increase or addition to the property of the corporation, and has it become permanently devoted as such to its uses? This is the test."

The misconception embodied in this statement was not a new one. It appears in the opinion in *Hemenway* v. *Hemenway*, 181 Mass. 406, from which source the trial court apparently derived it. As that opinion was the utterance of the same court which promulgated the rule in *Minot* v. *Paine*, 99 Mass. 101, and which has since repeatedly affirmed that rule, its expressions in argument were naturally accepted as authoritative without careful analysis. They will not, however, bear such analysis.

Capital is a term which, as applied to private corporations as ordinarily constituted, is used with widely varying significations. In one sense, the strict sense, it is employed to designate specifically the fund, property or other means contributed, or agreed to be contributed, by the shareowners as the financial basis for the prosecution of the business of the corporation, such contribution being made either directly through stock subscriptions, or indirectly through the declaration of stock dividends. As thus used the term signifies those resources whose dedication to the uses of the corporation is made the foundation for the issuance of certificates of capital stock, and which, as the result of the dedication, become irrevocably devoted to the satisfaction of all the obligations of the corporation. *State* v. *Norwich & W. R. Co.*, 30 Conn. 290; *Bailey* v. *Clark*, 21 Wall. 284; *Christensen* v. *Eno*, 106 N. Y. 97; *Iron Ry. Co.* v. *Lawrence Furnace Co.*, 49 Ohio St. 102; *Ried* v. *Eatonton Mfg. Co.*, 40 Ga. 98, 103; *Commonwealth* v. *Charlottesville P. B. & L. Co.*, 90 Va. 790; 1 Thompson's Comm. on Corporations, § 1060. Sometimes the term capital is used when what is

meant to be designated is that portion of the assets of a corporation, regardless of their source, which is utilized for the conduct of the corporate business and for the purpose of deriving therefrom gains and profits. *Iowa State Sav. Bank* v. *Burlington,* 98 Ia. 737, 739 ; *People* v. *Feitner,* 67 N. Y. Supp. 893 ; *Hemenway* v. *Hemenway,* 181 Mass. 406. Frequently the term is employed in a still wider sense, as descriptive of all the assets, gross or net, of a corporation, whatever their source, investment or employment. *Security Co.* v. *Hartford,* 61 Conn. 89 ; *Batterson's Appeal,* 72 id. 374; *People* v. *Coleman,* 126 N. Y. 433 ; *Ohio & M. R. Co.* v. *Weber,* 96 Ill. 443 ; *State ex rel. Batz* v. *Lewis,* 118 Wis. 432.

In *Hemenway* v. *Hemenway,* 181 Mass. 406, the court drew a distinction between those undistributed profits which have been applied to and invested in the increase and improvement of the property used in the business of the corporation, and those profits which may have been set aside for use in the conduct of the business but not invested in permanent works. The former, it said, was capital; the latter, "floating capital." The former, it said, was as effectually capitalized as they would have been through the declaration of a stock dividend. The trial court accepted this principle as a sound one, and thereon based its argument and conclusions, as witness its language already recited, to wit : "When such profits are expended upon the property of the corporation used in its business, or devoted to the acquisition of new property, or to the creation of a new business, these constitute a permanent addition to capital beyond the recall of the directors. Once capital always capital."

This proposition contains a fundamental error. The quality and incidents of surplus, however invested or employed, are not the same as those of capital within the strict meaning of that word. Capital, in that sense, constitutes a fund so set apart and devoted to the corporate uses and the security of creditors that the law jealously guards it from the encroachment of directors in the declaration of dividends. It is placed beyond their reach for that purpose, and

no way is left open to them to return it to the shareowners. Its dedication is irrevocable, and it must ever remain a fund held in trust for creditors, unless some judicial or other process authorized by legislation intervenes. Of it, it may well be said, "once capital always capital." It is not so of undistributed profits or surplus in any form. They may be effectually dedicated to corporate uses through the processes of a stock dividend, but until so dedicated they are not removed from the reach and control of directors. The manner of utilization may be changed, investments altered, permanent property sold and turned into cash, and experimental or other enterprises abandoned with a realization upon the investments therein, all at the discretion of directors, with no such artificial consequence that the assets thus employed change their character as the result of the process. Investment in permanent works does not and ought not to capitalize. Directors can in their discretion, fairly exercised, withhold profits and employ them in the conduct or enlargement of the business. By the same right they ought to be able to, and can, withdraw from any action which will enable the assets thus employed to be returned to their original condition as funds available for distribution to those to whom they might have been originally divided as dividends. Capital of this kind does not bear the perpetual stamp of capital. It simply constitutes a portion of the corporate assets which are within the discretionary control of the directors, which they may use for the corporate advantage in such ways as have the approval of their judgment, or, if that course seems wiser, cease using and by proper action withdraw from the corporate resources.

It follows that the court's second and third conclusions—in so far as they rest upon the mistaken proposition that undistributed profits when once invested in permanent works, property, improvements, or acquisitions or business extensions, become by force of that fact permanent additions to capital beyond the recall of directors and possessing the quality of capital in the strict sense—are unjustified. There is nothing growing out of the corporate relation or any of

the incidents of corporate estate, which can support the argument which is made to rebut the presumption that when a solvent, going concern declares a lawful dividend, it is one to be paid out of profits, since capital cannot be impaired. 2 Thompson's Comm. on Corporations, § 2192.

We have thus far pursued the line of argument of the trial court. There is another aspect of the question which possibly requires attention. While invested assets do not become capital in such sense that they thereafter have the quality and incidents of strict capital, it might be suggested that the character of such assets, by their investment in permanent works, improvements, or extensions, becomes such that, as between owners of successive stock interests, they ought in justice to be regarded as capital, in the general sense that they should thereafter belong to the capital rather than the income side of those interests. 1 Cook on Corporations, § 8.

The reason for this is not apparent. Their source is, presumptively, and for the most part in fact, profits. 2 Thompson's Comm. on Corporations, § 2192, and his article on "Corporations," 10 Cyc. 562. In so far as such is the case, their status as invested surplus has been created by the lawful fiat of directors, through the withholding and appropriation for use of what might have gone out as income. *Gibbons* v. *Mahon*, 136 U. S. 549; *Bouch* v. *Sproule*, L. R. 12 App. Cas. 385; *Pratt* v. *Pratt, Read & Co.*, 33 Conn. 446. It would seem fair that its return by the same means to its original status should be as possible as its first transition, and as fair that, when it has been transformed back into cash and a cash dividend declared and paid therefrom, the benefit of that dividend should be dependent upon the final act of the directorate thereon as upon some arbitrarily chosen intermediate act. Our adopted rule rests upon that proposition. It sees no injustice in its general application, and therefore admits of no relaxation when other conditions are not shown.

There remains to be considered still another aspect of the case. The court finds justification for its conclusions, and counsel for the remainder interests attempt to support the

judgment, upon a line of reasoning which differs in form at least from those already considered, although it may appear that in its ultimate analysis it rests upon the same fundamental erroneous conception. We have therefore to return to a consideration of the first of the court's conclusions as we have classified them.

The memorandum of decision discloses that the trial court accorded to the rule as adopted in this jurisdiction too much elasticity. We have already had occasion to discuss its importance and beneficient character when reasonably interpreted and applied. If our observations were well made and the commendations of eminent authorities justified, the conclusion would follow that it was not only a safe and sane one upon occasions, but also a rule which, if used with a proper regard for the substance and intent of the vote of declaration, would be a judicious one for general application and to which few, if any, exceptions should be admitted. In that spirit and to that effect it has been accepted by this and other courts. We have no occasion to make the academic inquiry as to whether, the rule being interpreted as suggested, any or what circumstances would justify a suspension of its operation. Certain it is that it ought not to be, and is not, one which yields whenever an investigation might appear to indicate its failure in a given case to accomplish what might be conceived to be exact justice upon the basis of some theoretical view of the ultimate rights of persons asserting conflicting successive stock interests. One of the purposes of the rule is to put an end to all such investigations, under all ordinary conditions at least. The prohibition of inquiry naturally and properly extends to all that field of investigation which we have thus far had under consideration in this case.

There remains, however, another aspect of the situation before us, which is relied upon as satisfying the conditions of what is termed an approved exception. As nothing else is pointed out as justifying a departure from the literal enforcement of the rule, we may well confine our discussion to the claim which is made. In *Second Universalist Church*

v. *Colegrove*, 74 Conn. 79, 83, we held that where the assets of a corporation were distributed to the shareowners in liquidation, they were, as between life tenants and remaindermen, to be treated as principal or capital and not income, although the distribution was made in the form of a cash dividend. See also to the same effect, *Gifford* v. *Thompson*, 115 Mass. 478. It is needless to inquire whether or not the principle involved in these cases constitutes a true exception to the general rule as properly interpreted. Whether it does or not, it is plain that it is a just and sound one. On the behalf of the remaindermen it is contended that this principle is as applicable to partial as to complete liquidations. By partial liquidations we understand to be meant proceedings involving the surrender by the corporation of portions of its capital, using that term in its strict sense. The contention may for the purposes of this case be conceded. But there has been no liquidation, complete or partial, of the Holyoke Company, nor anything tantamount thereto. The company has withdrawn from certain incidental branches or departments of its business as it was formerly, in the discretion of its directors, conducted, and converted what had been the investment of some of its assets in those departments into cash. The amount of the company's capital stock after the dividend remained unchanged. It was not only unimpaired, but continued to represent an ownership of net assets amounting to nearly three times the par value of its stock. The shares continued to be worth $300 or more each. The business of the corporation remained the same in its general character and purposes, and the inception of these proceedings found it a prosperous going concern—the same in all essentials it was before the city of Holyoke's threatened competition made a change in the scope of its operations an apparently wise act of corporate management. Clearly there was nothing in the nature of liquidation or a return of capital in the transaction under consideration.

The remaindermen claim that they will be aggrieved if the life tenants are permitted to take this dividend. That must depend upon the view which is taken of their rights

and equities. The advocates of judicial investigation for the purpose of ascertaining and establishing, in each case, the rights of the parties, have most commonly and confidently asserted that the rule which alone could lead to exact justice was one which recognized the right of remaindermen to have the capital, and those profits which had accumulated prior to the inception of the trust, retained in the *corpus*, and that of life tenants to receive subsequent accumulations. *Earp's Appeal*, 28 Pa. St. 368; *Smith's Estate*, 140 id. 344; 2 Thompson's Comm. on Corporations, § 2196; 2 Cook on Corporations, § 552. Even if this rule, which of all rules professes to be most mindful of strict equities, were accepted for application to the present situation, we should look in vain through this record to discover any suggestion that a disposition of this dividend as income would operate to the injury of those asserting the remainder interest in the *corpus*, which, after the dividend, remained worth three times what it was worth when the trust took effect.

It is conceded that the decision of the case is to be governed by the law of Connecticut. Massachusetts law would lead to the same result.

There is error; the judgment is reversed and the cause remanded for the rendition of judgment in accordance with the views herein expressed.

In this opinion the other judges concurred.