## UNITED STATES v. NEW YORK, N. H. & H. R. CO.

(District Court, D. Connecticut. May 17, 1919.)

Internal revenue ⬅9—Computation of net income of corporation; "paid-up capital stock."

　　In Corporation Excise Tax Act Aug. 5, 1909, § 38(2), providing that net income of a corporation shall be ascertained by deducting from gross income interest actually paid within the year on its indebtedness "to an amount of such * * * indebtedness not exceeding the paid-up capital stock of such corporation * * * outstanding at the close of the year," "paid-up capital stock" means such an amount received by the corporation as does not exceed the par value of the outstanding shares plus the amount received for any part-paid stock, and does not include any premium it may have received above par value.

　　[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Paid Up.]

Action by the United States against the New York, New Haven & Hartford Railroad Company. Judgment for the United States.

Raymond G. Lincoln, Asst. U. S. Atty., of Hartford, Conn.
Henry J. Hart, of Bangor, Me., for defendant.

THOMAS, District Judge. In this suit the government seeks to recover from the defendant additional excise taxes for the taxable years ending December 31, 1909, 1910, 1911, and 1912 under and by virtue of the provisions of section 38 of the act of Congress approved August 5, 1909 (36 Stat. 112), and so far as is here pertinent section 38 provides:

"That every corporation * * * organized for profit and having a capital stock represented by shares, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation * * * equivalent to ·one per centum upon· the entire net income over and above five thousand dollars received by it from all sources during such year," and that "such net income shall be ascertained by deducting from the gross amount of the income of such corporation, * * * received within the year from all sources, * * * (third) interest actually paid within the year on its bonded or other indebtedness to an amount of such bonded and other indebtedness not exceeding the paid-up capital stock of such corporation, * * * outstanding at the close of the year."

What did the Congress mean by "paid-up capital stock of such corporation, outstanding at the close of the year," for the purpose of ascertaining the net income of a corporation subject to the tax imposed by the act? is the sole question here presented for decision.

The complaint is in four counts, in each of which a certain additional amount over and above what the defendant has already paid is claimed to be due for each year. The allegations in all of the counts are substantially the same; the only variations being as to the year the tax was due and payable and as to the additional amount due the Government. After alleging the incorporation and residence of the defendant, and its liability to pay annually certain excise taxes as provided in the act, and that the defendant company was obligated to pay and did pay the tax of 1 per cent. of its net income, as returned, to the collector of internal revenue, the first count then proceeds and alleges as follows:

"Fourth. That in and by said return, under the head of 'Deductions,' the defendant included in said items of deduction for the said year ending December 31, 1909, the amount of seven million one hundred and eighty-two thousand three hundred and forty-three dollars and thirty-five cents, which said sum was the amount of interest paid during the year 1909 upon indebtedness to the amount of one hundred and fifty-eight million three hundred and seventy-four thousand two hundred and ninety-six dollars and sixteen cents ($158,-374,296.16), whereas the defendant, under the provisions of the act of Congress approved August 5, 1909, was only entitled to deduct interest to the amount of six million one hundred and sixty-seven thousand four hundred and five dollars and fifty cents ($6,167,405.50), said amount being interest paid upon indebtedness to the amount of one hundred and thirty-three million and eight hundred and fifty dollars ($133,000,850), which said sum was in fact the entire amount of the paid-up capital stock of the defendant outstanding at the close of the year 1909, and thereby the defendant did wrongfully and unlawfully deduct the amount of one million and fourteen thousand nine hundred and thirty-seven dollars and eighty-five cents ($1,014,937.85).

"Fifth. Thereafter, to wit, on or about the fifth day of October, 1916 (and more than three years after the return herein described was due), the Commissioner of Internal Revenue of the plaintiff discovered that said return of the defendant was incorrect and false as aforesaid in the particulars and items above set forth, and thereupon the defendant was notified thereof by the proper authority on behalf of the plaintiff, and that the additional amount of excise tax equivalent to one per cent. of said amount so unlawfully deducted was due from the defendant to the plaintiff, to wit, ten thousand one hundred and forty-nine dollars and thirty-eight cents ($10,149.38) for said year ending December 31, 1909, and thereupon the defendant refused and neglected and has ever since refused and neglected to amend or correct the aforesaid return, or to make payment of the said additional amount of the tax as aforesaid.

"Sixth. That for the reasons hereinbefore stated the defendant is liable to the plaintiff in the sum of ten thousand one hundred and forty-nine dollars

and thirty-eight cents ($10,149.38), together with interest thereon from the fifth day of October, 1916, being the date of the demand thereof.

"Seventh. That by reason of the refusal and neglect of the plaintiff to amend or correct the aforesaid return, or make payment of the said sum of $10,149.38, the defendant is liable to the plaintiff for a penalty of fifty per cent. in addition to said sum of $10,149.38, to wit, a penalty of five thousand and seventy-four dollars and sixty-nine cents ($5,074.69), together with interest thereon from said fifth day of October, 1916."

.'The following statement shows the variations in the allegations in the four counts of the complaint and the claims the government makes respecting the separate amounts due and the figures on which the deductions are based:

*First Count.*—Report for year ending December 31, 1909: The defendant deducted $7,182,343.35, which was interest paid on an alleged indebtedness of $158,374,296.16. Whereas plaintiff claims it was entitled to deduct only $6,167,405.50, which was interest paid on an actual indebtedness of $135,000,850. Therefore it unlawfully deducted $1,014,937.85, and there is due as an additional tax $10,149.38, and defendant is liable to a penalty of $5,074.69.

*Second Count.*—Report for year ending December 31, 1910: The defendant deducted $9,393,228.27, which was interest paid on an alleged indebtedness of $201,309,341.41. Whereas plaintiff claims it was entitled to deduct only $7,781,927.45, which was interest paid on an actual indebtedness of $155,272,175. Therefore it unlawfully deducted $1,611,300.82, and there is due as an additional tax $16,113.00 and defendant is liable to a penalty of $8,056.50.

*Third Count.*—Report for year ending December 31, 1911: The defendant deducted $10,945,432.22, which was interest paid on an alleged indebtedness of $233,807,597.66. Whereas plaintiff claims it was entitled to deduct only $9,039,259.42, which was interest paid on an actual indebtedness of $178,730,700. Therefore it unlawfully deducted $1,906,162.80, and there is due as an additional tax $19,061.63, and defendant is liable to a penalty of $9,530.81.

*Fourth Count.*—Report for year ending December 31, 1912: The defendant deducted $10,181,625.66, which was interest paid on an alleged indebtedness of $235,250,847.62. Whereas plaintiff claims it was entitled to deduct only $8,239,995.49, which was interest paid on an actual indebtedness of $179,775,700, which was entire amount of "Paid-Up Capital Stock." Therefore it unlawfully deducted $1,941,630.17, and there is due as an additional tax $19,416.30, and defendant is liable to a penalty of $9,708.15.

The answer is a general denial of the material allegations of each count. The facts were stipulated.

The stipulation shows that all of the shares of the capital stock of the defendant corporation which were issued for sums in excess of $100, the par value, were disposed of by two methods: (1) To the public generally; (2) to stockholders upon subscription. The shares of stock disposed of to the public generally were at prices ranging from $144 per share to $258 per share, and until said varying sums for the respective shares issued were received by the defendant company, the purchaser of the stock was not entitled to and did not receive a

certificate representing the number of shares of his purchase, and the shares of stock were not considered as paid for in full until said respective sums had been received by the corporation, said shares thus subscribed were to be paid for in one payment, and at the time the certificates were issued the company had actually received therefor the varying sums above mentioned for the respective shares.

In relation to subscriptions by and the issuing of shares of stock to stockholders, it appears that on April 11, 1903, 67,532 shares of the capital stock of the defendant were offered at $175 per share, and that these subscriptions were limited to the stockholders, whose subscriptions were to be for full shares in the ratio of one share for each 10 shares held by ownership of stock or by assignment of rights, either or both, and that these were fully subscribed for by stockholders. The shares of this stock were payable, at the option of the subscriber, in installments, as follows: $50 on June 1, 1903; $40 on August 1, 1903; $40 on November 2, 1903; and $45 on January 2, 1904. But none of the shares of this stock was to be considered as fully paid and nonassessable until the full sum of $175 had been paid on each share, either by the subscriber therefor or his transferee, although the nominal or par value of all shares is, and always has been, $100.

When the corporation had received the full subscription price for a share of this stock, a negotiable full-paid receipt was issued to the person making the payment. When, however, only an installment payment was made, a part-payment form or receipt was given, and, like the full-paid receipt, was both negotiable and transferable, and the transferee of record became responsible for the additional payments required by the terms of the original subscription. Shortly after the entire subscription price of this stock had been fully paid (at the rate of $175 per share), certificates of stock were duly issued to the persons entitled thereto. The forms of receipts which were issued for full-paid subscriptions contained the statement that—

"As soon as practicable after January 2, 1904, said company will deliver to the legal holder hereof, in exchange herefor, a certificate for ——— shares of the new capital stock of said company, with interest from date to December 31, 1903, on $100/175$ of said sum at the same rate as dividends paid on the capital stock of the company during said period."

On December 20, 1909, the defendant company offered for subscription to its stockholders, 446,490 shares of its capital stock at the price of $125 per share, under similar conditions of payment (except as to dates and amounts) as the offer made in April, 1903, and the first payment thereon, to wit, $31.25 per share was due in the month of December, 1909. No share of this stock was to be considered as paid-up and nonassessable until $125 had been paid the defendant company.

Prior to July 1, 1909, which was the date on which the first uniform rules of accounting issued by the Interstate Commerce Commission became effective, no uniform method of accounting had been followed by railroad corporations relative to the setting up or disposal of the excess amount (over par value) received from sales of their capital stocks, though the statutes of some states required that all sums

above the par or nominal value thus received by a corporation should be entered in and credited to "Premium Account." Other corporations, where no such statutes existed, were accustomed to enter all amounts thus received (in excess of the par or nominal value) in their "Profit and Loss Account." But, whichever method was followed, the amount of excess receipts could always be determined by reference to and analysis of the profit and loss accounts of such companies.

The uniform regulation rules of the Interstate Commerce Commission required that on and after July 1, 1909, all sums received by steam railroads in excess of $100 a share for capital stock should be set forth in a "Premium Account." It was, however, left to the option of each railroad company, accustomed to enter such excess amounts as credits under "Profit and Loss," to change all such entries made prior to July 1, 1909, to "Premium Account," or to allow the same to stand as originally entered. On and after July 1, 1909, the defendant corporation's entries of excess on sales of its capital stock over the par value thereof were set up on the balance sheets as

*Stock.*

Capital stock (in hands of public)..................................
Premium on capital stock (since July 1, 1909).....................
  Total ..........................................................

Had the profit and loss account been analyzed, and the amounts received by the defendant on sales of its capital stock in excess of $100 per share been transferred from profit and loss account to premium account, the aggregate of the capital stock and the premium account for the years 1909, 1910, 1911, and 1912 would have been as outlined in the agreed statement of facts.

The outstanding shares of the paid-up capital stock, *for which certificates of stock had been issued,* numbered 1,218,781 on the 31st day of December, 1909, and the same number was outstanding on December 31, 1910. On December 31, 1911, this number increased to 1,789,792, and by December 31, 1912, to 1,797,757 shares. On the basis of par the total value of the outstanding shares on the last day of the years 1909 and 1910 was $121,878,100, and on the last day of the years 1911 and 1912 it was $178,979,200 and $179,775,700, respectively.

In addition to the outstanding shares on December 31, 1909, for which certificates of stock had been issued, the company up to that time had been paid $142,375 on 1,139 full-paid shares of the December 20, 1909, offer at $125 per share. The company had also been paid at that time $13,871,406.25 in part payment of 443,771 shares of such stock. Of the last-mentioned sum, $13,864,281.25 was first payments on 443,657 shares subscribed for, and $7,125 from first and second installment payments on 114 shares made to that date. For all of these payments the defendant had issued proper forms of receipts.

As of December 31, 1909, the actual amount which the defendant company had received from sales of shares of its stock outstanding on that date, and for which certificates of stock had been issued, and for

the full-paid and part-paid subscriptions of the December 20, 1909, offer, for which forms of receipts had also been given, was $173,580,-528.91, all of which had been invested, or set aside for investment, in the physical property of the company and in the securities of its subsidiary and affiliated transportation companies.

By December 31, 1910, the company had realized a total of $205,-554,497.60 from the same source. Of this amount $16,980,625 represented payments on 135,845 full-paid additional shares of stock at $125 per share, for which no certificates had then been issued, and $29,007,124 represented part payments on 310,609 other shares of the December 20, 1909, offer, as follows: $1,656.25 as first payments on 53 shares, $218,312.50 as first and second payments on 3,483 shares, and $28,787,156.25 as first, second, and third payments on 307,063 shares. The whole amount thus shown to have been paid defendant on account of the capital stock subscriptions and certificates and receipts had been invested in the same manner as above stated.

The gross amount realized by the defendant from receipts on account of subscriptions and sales of the 1,789,792 shares of its capital stock outstanding as of December 31, 1911, was $234,056,097.66, and as of December 31, 1912, on the 1,797,757 shares then outstanding, it was $235,250,847.66. All of the funds thus received had been invested or held for investment. On December 31, 1911, the defendant had, of its total outstanding shares, 2,485 shares held in special insurance funds.

The number of outstanding shares of the capital stock for which the defendant had received only the par value was the same as on the last day of each of the four years mentioned, to wit, 745,302 shares. Of the remaining number, the full-paid shares for which the company had received more than par value, including full-paid shares for which only forms of receipts were given, was 474,618 as of December 31, 1909; 509,324 as of December 31, 1910; 1,044,490 as of December 31, 1911; and 1,052,458 as of December 31, 1912.

The total amount of excess over the par value, which the company had received for shares of its capital stock as of December 31, 1912, was $58,475,147.66; 1,314 shares were disposed of in 1875, on which the company realized as premium $58,159.

Of the outstanding shares on the 31st day of December, 1909, and 1910, which had been issued at prices above the par value, 67,532 shares had been subscribed for by stockholders of the defendant company, and the remainder sold to the public generally. On December 31, 1911, the number of such shares for which the stockholders had subscribed reached 514,024, and those sold to the public generally numbered 530,466, and by December 31, 1912, the number of shares sold to the public had increased to 538,431.

In crediting its account with reference to receipts from partial payment subscriptions from the December 20, 1909, offer as of December 31, 1909, the aggregate credited to premium account on the 444,771 part-paid shares was $2,774,281.25, and $11,097,125 was credited to capital stock. (The stipulation mentions 444,771, but I think the total shares should be 443,771.) This was done as a convenience in

bookkeeping. During the following year $5,801,425 of the $29,007,-124 received as partial payments on 310,609 shares was credited to premium account and the balance to capital stock.

In the return to the collector of internal revenue for the year ending December 31, 1909, the defendant set forth $158,374,296.16 as the total amount of its outstanding paid-up capital stock as of that date, and intended that the amount stated should represent the total sum received up to that date for shares of stock issued and outstanding, as also for full-paid and part-paid stock receipts issued by the defendant and outstanding at the time, while as a matter of fact the defendant had, up to that date, actually received $173,580,528.91 for its outstanding shares covered by certificates and for part-paid and full-paid shares for which it had only issued appropriate receipts. It however failed, through error or omission, to include $15,206,232.75 of the actual amount it had received on account of subscriptions to the capital stock of the corporation.

When making its deductions from gross income, the defendant claimed $7,182,343.25 as interest paid on an indebtedness of $158,374,-296.16, which was the amount it had returned as the total amount of its outstanding paid-up capital stock on December 31, 1909; but it did not deduct, because of an oversight, $608,249.31 representing interest paid on an indebtedness amounting to $15,206,232.73—the amount which it had received as full-paid and part-paid subscriptions to its capital stock, in addition to the sum of $158,374,229.16, which it had reported as the total of its outstanding capital stock on December 31, 1909.

In its return for the year ending December 31, 1910, the defendant set forth $201,309,341.41 as the total of its paid-up capital stock outstanding at the close of that year, intending that the amount stated should represent the actual sum received on account of stock shares issued, as well as for receipts which it had given for full-paid and part-paid stock subscriptions for which no shares had yet been issued, whereas it had, in truth, up to that time actually received $205,554,-497.66 on account of stock shares issued and for full-paid and part-paid subscriptions to the capital stock. The failure to include the remaining $4,245,156.25 was due to oversight or error.

In the same return the defendant claimed $9,393,338.27 in reduction of its gross income for the year as the sum paid by it as interest on an indebtedness of $201,309,341.41; the latter sum being the same amount it had reported as the receipts for outstanding capital stock on December 31, 1910, and for receipts given for full-paid and part-paid stock subscriptions to that date. It failed, however, to claim a further deduction of $148,580.47 as a claim for interest paid on $4,-245,156.24, which represents the sum the defendant omitted to include as a part of the amount it had actually received on account of subscriptions of its capital stock.

Under similar circumstances, when making its return for the year ending December 31, 1911, the defendant set forth $233,807,597.66 as the total amount of its paid-up capital stock outstanding at the close of that year, but failed to include the 2,485 shares of its stock, which

265 F.—22

it was holding in special insurance funds. In its claims for deductions from gross income, defendant set forth $10,945,422.22 as the amount of interest it had paid during the year on an indebtedness of $233,607,597.66, instead of an indebtedness of $234,056,097.66, which amount would represent the amount returned as outstanding paid-up capital stock, plus the 2,485 shares held in the special insurance fund at the par value of $100 per share.

When it also made the return required for the year ending December 31, 1912, the defendant stated that its outstanding capital stock was $235,250,847.66, which amount it claimed was the total sum received by it for the shares of stock outstanding on that date, and claimed $10,-181,625.66 as a deduction from gross income as representing interest paid on an indebtedness of $235,250,847.66.

It is the contention of the plaintiff that, under the provisions of section 38 of the act, "paid-up capital stock of the corporation, * * * outstanding at the close of the year," is an amount not exceeding the par value of the outstanding shares plus the amount received for any part-paid stock, whereas the defendant claims that "paid-up capital stock of the corporation" is the aggregate amount received by the corporation for the outstanding full-paid shares, the full-paid and part-paid stock receipts by it issued, and includes all sums so received, even though such sums are in excess of the par value, or $100 per share.

At oral argument, and in his brief, counsel for the defendant relies upon Stamford Trust Co. v. Yale & Towne Mfg. Co., 83 Conn. 43, 75 Atl. 90, to support his proposition that the amount paid into the treasury of the defendant as a result of subscription made to its capital stock represented in fact the "paid-up capital stock" of the company, and attention is directed to that part of the opinion found in 83 Conn. 49, 75 Atl. 92. Chief Justice Baldwin said:

"The term 'capital stock of a corporation,' taken in its strict and primary sense, 'is employed to designate specifically the fund, property, or other means contributed, or agreed to be contributed, by the shareholders as the financial basis for the prosecution of the business of the corporation, such contribution being made either directly through stock subscriptions, or indirectly through the declaration of stock dividends. As thus used the term signifies those resources whose dedication to the uses of the corporation is made the foundation for the issuance of certificates of capital stock, and which, as the result of the dedication, become irrevocably devoted to the satisfaction of all the obligations of the corporation.'"

All of the language used after the words "primary sense," supra, is a quotation from the opinion of Justice Prentice in Smith v. Dana, 77 Conn. 543, 552, 60 Atl. 117, 121 (69 L. R. A. 76, 107 Am. St. Rep. 51), in which case the language quoted was used as applying to the term "corporation capital."

In endeavoring to ascertain what is intended by the use of certain words, consideration should not be confined solely to the language used, but it should be considered in the light of all the facts and circumstances in relation to which the language was employed. A close study of the cases referred to, as well as that of Security Co. v. Town of Hartford, 61 Conn. 89, 23 Atl. 699, it must necessarily lead to the

conclusion that in making use of the language employed by Justice Prentice in Smith v. Dana, supra, the eminent jurist who wrote the opinion in Yale & Towne Case, supra, intended that the same would be understood as applying to the original foundation or basis of a corporation's assets, or, in other words, that capital stock consists of the original issue of paid-up stock of any corporation at par value plus the amounts of any paid-up additional issues of its capital stock, also at par value, and constitutes a fund which the corporation directors, without a full compliance with the laws relative to the increase or reduction of capital stock, are not permitted to enlarge or diminish, and that therefore the nonassessable interest of each individual shareholder in the corporation's assets must remain in proportion to his ownership of its paid-up capital stock at *par value*.

This conclusion seems more than justified, especially in view of the several references made by Chief Justice Baldwin in the opinion cited to the requirements of the statutes of Connecticut relative to the organization of corporations with capital stock and the methods to be followed when the capital stock of a corporation is to be increased beyond the amount authorized at the time of incorporation.

There is nothing contained in any section of the general incorporation laws of Connecticut, nor in any section of the private acts, in several of which the charter was amended and permission granted the defendant company to increase the amount of its capital stock, which indicates that any part of its outstanding shares, whether represented by certificates or negotiable receipts issued by its duly authorized officers, were to be considered as other than at par value for the purpose of ascertaining the amount required by statute to be paid as an additional franchise tax on the amount of its increased capital stock.

In section 3435 of the General Statutes of 1918, it is specifically provided in relation to the liability of shareholders of any corporation that—

"No subscriber for or holder of stock shall be liable as such for any payment of such stock, or for any debt of the corporation, after the par value of his stock has been paid."

And in section 3492 of the General Statutes of 1918, which has reference to the increase of capital stock by specially chartered corporations, it is provided that—

"Before any such corporation shall issue any shares of such increased capital stock so voted, a majority of the directors shall make, sign and swear to and file in the office of the secretary of the state a certificate setting forth the number of shares so voted and the *par value* thereof. The secretary shall examine the same, and if he shall find that it conforms to law and that all taxes have been paid in accordance with the provisions of section 3502, shall indorse thereon the word 'Approved,' with his name and official title, and shall thereupon record such certificate in a book kept by him for that purpose."

Section 3502 of the General Statutes of 1918 also contains the provision that—

"Whenever any specially chartered corporation shall vote to increase the amount of its capital stock in accordance with the provisions of this chapter

or of any other general or special law affecting it, such corporation shall pay to the state treasurer, before any shares of such increased capital stock shall be issued, a further tax of one dollar on each one thousand dollars of the total increased capital stock so voted, but no additional franchise tax shall be required upon stock upon which the corporation has paid the full franchise tax required by the law in force at the time of such payment."

While one or more of the special laws of Connecticut provide that no shares of the increased capital stock of the defendant shall be issued for less than $100 per share, and that all of such shares as would remain unsubscribed for by shareholders of the corporation, together with any unpaid parts of subscribed for shares, should be offered for sale at public auction, this ought not to be construed to mean that any different construction than as above indicated was intended to be placed upon the term "paid-up capital stock" by the Connecticut Legislature, as the evident intention of such provisions was to protect the interests of each shareholder of the defendant company and of those corporations which were under control of or to become a part of the defendant company by merger, as far as possible, and prevent the formation of combinations which might be sought for the purpose of obtaining control of the corporation's affairs and against the interest of the stockholders, and this view seems wholly justified when, upon reading the full text of the several special acts hereinafter referred to, it becomes apparent that the full increased issue of shares permitted by such acts were primarily expected to be subscribed for by the then shareholders of the defendant company, or by owners of stock in other corporations which were under the defendant's control, or were expected to become merged with defendant, and that the amounts of such subscriptions were limited to one full share in certain proportions to the shareholders' ownership of the minimum number mentioned in the act. See the following special acts passed by the Connecticut General Assembly: Act of June 30, 1866, page 88, vol. 6; Act of May 28, 1868, page 319, vol. 6; Act of July 26 and 27, 1871, pages 252 and 254, vol. 7; Act of March 23, 1880, page 411, vol. 8; Act of June 14, 1889, page 1298, vol. 10; Act of March 2, 1893, page 32, vol. 11; Act of May 29, 1895, page 348, vol. 12; Act of March 15, 1899, page 41, vol. 13; Act of March 19, 1903, page 15, vol. 14; Act of June 29, 1905, page 869, vol. 14; Act of March 27, 1907, page 40, Special Laws of 1907.

That no interpretation should be given other than that the law intended, that the shares of the capital stock of the defendant should be figured as at par value when making allowance for the deduction of the amounts of interest paid during each of the years mentioned, seems fully supported by the interpretation which the bookkeeping department of the defendant must have considered the proper one to be applied, in order to have pursued, prior to July 1, 1909, the method of entering the value of such shares as of par value under its capital stock account, and all amounts over and above the par value thereof received by the defendant on sales of its capital stock in its profit and loss account.

Then, again, nothing has been shown to indicate that any extra tax or payment required by the state of Connecticut to be paid on each

$1,000 of increased capital stock which might be issued by the defendant was figured on any other basis than that of the par value of such additional shares of stock.

Still another reason for holding that the interpretation above suggested is the proper one arises from the fact that in the form of full-paid receipts, which the treasurer of the defendant gave to subscribers who had paid for their subscriptions in the 1903 additional issue of its capital stock, there is contained the following:

"Said company will deliver ———— a certificate for ———— shares of the new capital stock of said company, with interest from date to December 31, 1903, on $100/175$ of said sum at the same rate as dividends paid on the capital stock of the company during said period."

In General Bonding & Casualty Ins. Co. v. Mosely (Tex. Civ. App.) 174 S. W. 1031, the court said:

" 'Capital stock' means the fund contributed by the shareholders as the financial basis of the corporation's business, and the term 'paid-up' contains the idea of full payment of the *authorized capital* into the corporation either in money or its equivalent in property."

And the court in Williams v. Brewster, 117 Wis. 370, 93 N. W. 479, said:

" 'Capital fully paid in' contains the idea of full payment of the *authorized capital* into the corporation, either in money or its equivalent in property."

Where state statutes provide a liability on shareholders for debts of the corporation to the "extent" or "amount" of their stock in such corporation, this is interpreted to mean a liability to the extent of the nominal or face value of the stock without reference to the amount that may have been paid thereon. Willis v. St. Paul Sanitation Co. et al., 48 Minn. 140, 50 N. W. 1110, 16 L. R. A. 281, 31 Am. St. Rep. 626.

In Houston Belt & Terminal Co. v. U. S., 250 Fed. 1, 162 C. C. A. 173, it was held that interest which was paid during 1909, 1910, and 1911 by the four "tenant" lines, who were sureties for the payment of a $5,000,000 bond issue to the Central Trust Company, was to be considered as income received by the Terminal Company during those years, although no part of the interest payment had been made to the Terminal Company, and the whole amount thereof went direct to the Central Trust Company as payment for interest due on the stated bond issue, and the court further held that no portion of the interest thus paid by the tenant companies on the $5,000,000 bonded indebtedness of the Terminal Company, over and above an amount equal to interest on $25,000 which was the *par value of the paid-up capital stock* of the Terminal Company, and which stock was equally contributed by the four tenant companies who were the only subscribers thereto, should be allowed, as a proper deduction from gross income of the Terminal Company under the provisions of section 38 of the act now under consideration, and as a result the suit which the Terminal Company brought against the government for the recovery of the claimed excess taxes paid was decided adversely to the Terminal Company.

A similar decision was rendered by the Circuit Court of Appeals for the Eighth Circuit in Altheimer & Rawlings Investment Co. v. Allen, 248 Fed. 688, 160 C. C. A. 588, sustaining the decision of the District Judge, whose opinion will be found in 246 Fed. 270. There the plaintiff, a brokerage corporation with an authorized capital stock of $15,000, purchased and carried securities for customers. On those purchases the customers paid only part of the purchase price, and consequently owed the corporation balances on which they paid interest, while the corporation in turn also paid on the purchases only a part of the purchase price, and accordingly owed balances on them on which it also paid interest, but the' interest received by the corporation from its customers on such purchases exceeded the interest paid by it on the purchases. In making its return to the collector of internal revenue as required by the statute, the plaintiff included as gross income, the difference in amounts between the' interest paid it by its customers and that which it had paid on the purchases. The Commissioner of Internal Revenue ruled, however, that the entire amount received by the corporation from its customers should be included as gross income, and that the aggregate deductions from interest paid by the plaintiff, whether for interest on said purchases or for interest paid otherwise, should be limited to $15,000. During each of the years 1909, 1910, and 1911, the plaintiff paid for interest on indebtedness other than that for said purchases $15,000 or more. Accordingly the Commissioner allowed no deduction to be made for the interest paid by plaintiff on said purchases and made an assessment against the plaintiff for an increased amount for each of the three years mentioned. These assessments were paid under protest by plaintiff. Subsequently suit was brought to recover the alleged excess payments after the preliminary proceedings required by the statute had been taken.

In Boston Terminal Co. v. Gill, Collector, 246 Fed. 664, 158 C. C. A. 620 (three cases) where judgments were recorded for the defendant by the District Judge and affirmed on appeal, the contention of the government was upheld on the point that the deduction from gross income allowable by the Excise Tax Law of August 5, 1909, for interest payments made during the years 1909, 1910, and 1911, on the bonded or other indebtedness of a corporation coming within the province of the statute, must be limited to the amount of interest paid on a sum equal to the nominal or par value of the outstanding capital stock of such corporation. Although it was shown in these cases that $490,000 had been actually paid during each of the years mentioned by or in behalf of the plaintiff corporation for interest on its bonded indebtedness, the amount which the plaintiff was allowed to deduct from its gross income for such interest payments was but $17,500 for each year, which was only 3½ per cent. on its authorized outstanding capital stock of $500,000.

In Armstrong et al. v. Union Trust & Savings Bank, 248 Fed. 268, on page 270, 160 C. C. A. 346, on page 348, the Circuit Court of Appeals for the Ninth Circuit said: ·

"Capital stock has a distinct characteristic, and represents the capital upon which the corporation is authorized to do business. It may be paid up, or

merely subscribed. If the latter, the subscriber is liable to the company for its par value, and it constitutes one of the assets of the company, to all of which creditors may look for payment of their demands."

In Anderson v. Forty-Two Broadway Co., 239 U. S. 69, 36 Sup. Ct. 17, 60 L. Ed. 152, an interest payment deduction of an amount only equal to interest computed on $600 was allowed, because the outstanding paid-up capital stock of the defendant corporation was only $600, notwithstanding the fact that the corporation actually paid interest on its bonded indebtedness of $4,750,000.

Therefore the conclusion is imperative, after a careful analysis of the law and a consideration of the principles involved in all cases cited by both sides, that the "paid-up capital stock" of the corporation, as used in section 38 of the act, means such an amount received by the corporation as does not exceed the par value of the outstanding shares, plus the amount received for any part-paid stock, and that it does not mean the aggregate amount received by the corporation for the shares, the full-paid stock receipts, and part-paid stock receipts issued by it, even though said sum be in excess of the par value.

Judgment will therefore be entered on each of the four counts in favor of the plaintiff for such amount, with interest from the appropriate date, as shall be found payable as an excise tax over and above that claimed and paid by the defendant in accordance with this opinion. Costs to abide the event.

The defendant filed its return within the time prescribed by law. No question was raised by the government as to any of the returns until the spring of 1916, at which time the company was asked to accept the government's view of paid-up capital stock, and make new returns, and pay the additional taxes. This the company fairly declined to do. Under the circumstances, no penalty will be imposed.

Decree accordingly.